Argued and submitted February 24, affirmed April 11, 1984

In the Matter of Kristina and Vincent
Grannis, Children.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

GRANNIS,
*Appellant.*

In the Matter of Kristina and Vincent
Grannis, Children.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

GRANNIS et al,
*Appellants.*

(78,217; CA A28159)

680 P2d 660

Angela Sherbo, Legal Aid Service, Portland, argued the cause for appellants. With her on the briefs was Michael H. Marcus, Legal Aid Service, Portland.

Christine A. Chute, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, Helen M. Rockett, Assistant Attorney General, and Jan Peter Londahl, Assistant Attorney General, Salem.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Mother appeals from a juvenile court order finding her nine-month-old son[1] to be within the court's jurisdiction, making him a ward of the court and committing him temporarily to Children's Services Division (CSD) for care, placement and supervision. She also appeals from the court's order denying her motion for attorney fees.[2]

On November 30, 1982, a petition was filed alleging that the son and an older daughter of mother were within the court's jurisdiction because, *inter alia,* "[t]he mother has physically [abused the daughter] * * * and is likely to endanger any child in her custody due to her psychological make-up." The state produced evidence that mother was guilty of physical abuse of the daughter. It also offered the testimony and report of a clinical psychologist, who had interviewed mother and reviewed the results of a Minnesota Multiphasic Personality Inventory (MMPI) test that had been administered to her. The psychologist's evidence was to the effect that mother has "pathologically elevated" anger and paranoia and is unable to "control her hostile impulses" and that "the safety of her children is at risk in her custody."

Mother argues that the evidence was insufficient to prove any risk that *the son* would be physically abused. She contends that proof of abusive conduct toward the daughter, plus the entirely predictive opinion of the psychologist, does not suffice. She also argues that the psychologist had no direct knowledge of mother's relationship with the children and did not see the children or observe mother's interaction with them and that the psychologist's opinion was based on unreliable test data and on mother's feelings of anger toward CSD and the father rather than toward the children. We disagree.

■ There was ample evidence—and we find—that mother physically abused the daughter. We are also persuaded by the psychologist's evidence that the personality and psychological factors that caused mother to abuse the daughter

---

[1] The daughter had been made a ward of the court in an earlier proceeding, and the wardship was continued in the present one. No appeal was taken from the earlier order, and no argument is made now about the court's disposition with respect to the daughter. *See State ex rel Juv. Dept. v. Nagle,* 36 Or App 237, 584 P2d 338 (1978).

[2] Legal Aid Service, with whom mother's attorney is affiliated, also purports to appeal from the latter order.

would create a serious risk of abuse of the son if mother retains physical custody and if improvement in her psychological condition and parenting skills does not occur.[3] Many of the specific points mother makes in her arguments challenge the methodology the psychologist used in evaluating mother's parenting potential and potential for abuse. We have considered those points and remain persuaded by the psychologist's findings and opinion.

Mother relies on *State ex rel Juv. Dept. v. Wyatt,* 34 Or App 793, 579 P2d 889, *rev den* 283 Or 503 (1978), where we said:

> "On this record, we cannot agree with the decision to terminate parental rights. The existence of a prognosis that a person will, at some time in the future, turn out to be a poor parent should not, standing alone, serve as the basis for terminating parental rights. There should be some demonstration of a present failure to properly perform the parenting role (as, for example, in the case of a severely mentally retarded parent) or, in the alternative, substantial certainty that the parent will not be able to perform that role with minimal adequacy." 34 Or App at 797.

*See also State ex rel Juv. Dept. v. Anderson,* 35 Or App 561, 582 P2d 29 (1978), *rev den* 285 Or 1 (1979).

Mother argues that the predictive opinion evidence in this case, like the evidence in *Wyatt,* is insufficient to support the disposition. We disagree for two reasons. First, *Wyatt* was a termination of parental rights case; this is not. We emphasized in *Wyatt:*

> "Our refusal to terminate parental rights does not mean that the child has to be given back to the parent, or, if the child is returned to the parent, that the child-parent relationship cannot be closely supervised. * * *" 34 Or App at 799.

In other words, we concluded in *Wyatt* that, although insufficient to justify termination, the facts did support a disposition of the kind we review here.

---

[3] On cross-examination, mother's counsel asked the psychologist whether it is "possible that a parent may be abusive toward one child and not abusive toward another child in the same family," and the witness answered that it is "highly unlikely."

Our second reason for finding *Wyatt* to be of no assistance to mother is that the evidence in the two cases is not comparable. In *Wyatt,* as here, there was a professional prediction of potential abuse, based on MMPI results and on the mother's history. However, there was also direct evidence that any inappropriate behavior of the mother toward the child was modified "when she was told it was inappropriate," and that

"* * * [e]very witness testified that the mother claimed to love the child; her behavior toward the child supported this conclusion. * * *" 34 Or App at 797.

Conversely, the evidence in this case shows that mother has *in fact* abused her daughter and that she is resistant to efforts to bring about improvement. The direct proof substantiates the psychologist's predictive opinion that proximity to mother places the son in physical danger, and we reject mother's assignments of error directed against the trial court's findings.[4]

■ Mother makes three assignments of error in support of her appeal from the denial of her motion for attorney fees, all of which turn on her contention that, as an indigent, she had a due process right to court-appointed counsel. She established that she is indigent and requested appointment of counsel at a preliminary hearing before a referee and at a pretrial conference with a deputy district attorney and a juvenile court caseworker. Both requests were denied. The threshold question is whether we can consider her contention, in the light of the fact that mother *was* represented by counsel at the most significant phase of the trial court proceedings. The simple answer is that the denial of mother's request for appointment of counsel caused her to be unrepresented at the preliminary stage of the proceedings, before Legal Aid Service provided her with an attorney. Moreover, mother has a continuing interest in the resolution of the constitutional issue, because the proceeding itself is a continuing one. The court retains jurisdiction and, by its terms, the court's order makes the disposition subject to later review. *See also Whipple v. OSAA,* 52 Or App 419, 421, n 3, 629 P2d 384, *rev den* 291 Or 504 (1981). We turn to the merits.

---

[4] It is unnecessary for us to address the parties' arguments concerning allegations in the petition other than the child abuse allegations.

In *Lassiter v. Department of Social Services,* 452 US 18, 101 S Ct 2153, 68 L Ed 2d 640 (1981), the Court held that indigent parents in parental rights termination cases may have a due process right, determinable on a case-by-case basis, to the appointment of counsel. It explained:

"* * * [T]he Court's precedents speak with one voice about what 'fundamental fairness' has meant when the Court has considered the right to appointed counsel, and we thus draw from them the presumption that an indigent litigant has a right to appointed counsel only when, if he loses, he may be deprived of his physical liberty. It is against this presumption that all the other elements in the due process decision must be measured.

"The case of *Mathews v. Eldridge,* 424 U.S. 319, 335, [96 S Ct 893, 47 L Ed 2d 18 (1976),] propounds three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions. We must balance these elements against each other, and then set their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.

"* * * * *

"If, in a given case, the parent's interests were at their strongest, the State's interests were at their weakest, and the risks of error were at their peak, it could not be said that the *Eldridge* factors did not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel. But since the *Eldridge* factors will not always be so distributed, and since 'due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed,' *Gagnon v. Scarpelli,* 411 US [778], at 788, [93 S Ct 1756, 36 L Ed 2d 656 (1973)], neither can we say that the Constitution requires the appointment of counsel in every parental termination proceeding. We therefore adopt the standard found appropriate in *Gagnon v. Scarpelli,* and leave the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered in the first instance by the trial court, subject, of course, to appellate review. * * *" 452 US at 26-27, 31-32.

*See also State v. Jamison,* 251 Or 114, 444 P2d 15, 444 P2d 1005 (1968).

The issue in this case is whether the same conclusion follows in juvenile court proceedings when the parent's threatened loss is something less than a complete and irrevocable termination of her parental rights. Mother cites two cases, one decided before *Lassiter* and one decided after, that expressly hold there is a due process right to appointed counsel for indigent parents in some dependency proceedings and that the determination of whether counsel must be appointed in a particular case is to be made by the trial court initially, subject to appellate review. In *Cleaver v. Wilcox*, 499 F2d 940 (9th Cir 1974), the court based its conclusion on reasoning very similar to that of the Supreme Court in *Lassiter* seven years later:

> "* * * When an agency of the state seeks to remove a child from the custody of parents who say they are qualified to rear the child, both the parents and the state have interest in accurate findings of fact and informed juvenile-court supervision. The state's interest in saving public money does not outweigh society's interest in preserving viable family units and the parent's interest in not being unfairly deprived of control and custody of a child. Protection of a right as fundamental as that of child custody cannot be denied by asserting that counsel in civil litigation has always depended upon the free-enterprise generalization that one usually gets what one pays for. The 'civil litigation' generalization overlooks the nature of the rights in question and the relative powers of the antagonists. Despite the informality of the juvenile dependency hearings the parent, untutored in the law, may well have difficulty presenting his or her version of disputed facts, cross-examining witnesses, or working with documentary evidence. *Cf.* Gagnon v. Scarpelli, 411 U.S. at 787.

> "Without undertaking to write a manual for state judges on when to appoint counsel in particular cases, we note some of the general factors which should be considered: One such factor is the length of the separation which the parents may face. [The California statutes] give the juvenile court authority to order varying degrees of restrictions on parental control once a child has been declared a dependent child of the court. The greater the probability of removal, based upon the facts of the case and the social-service worker's recommendation, the more pressing will be the need for appointed counsel. A second factor is the presence or absence of parental consent or of disputed facts. Also relevant is the parent's ability to cope with relevant documents and the examination of witnesses. The more complex the case, the more counsel can contribute

to the hearings. Finally, should the judge refuse a request for counsel, it is important that the grounds for the refusal be stated in the record so that meaningful judicial review of the refusal can be had in the state courts.

"This court does not believe it necessary to impose upon an excellent state-court system an inflexible constitutional rule which requires appointed counsel in every dependency proceeding. * * * Parents are entitled to a judicial decision on the right to counsel in each case. The determination should be made with the understanding that due process requires the state to appoint counsel whenever an indigent parent, unable to present his or her case properly, faces a substantial possibility of the loss of custody or of prolonged separation from the child. Application of these guidelines can and should be made by the state courts on a case-by-case basis." 499 F2d at 945. (Footnote omitted.)

Largely the same reasoning led to the same holding in *Davis v. Page,* 714 F2d 512 (5th Cir 1983), where the court stated:

"Our function is not to question the wisdom of the *Lassiter* opinion, but rather to apply it straightforwardly. So applied, the conclusion is inescapable that *Lassiter* requires a case-by-case analysis of the right to counsel for indigent parents in Florida dependency proceedings. * * *" 714 F2d at 518.

It is unnecessary for us to supplement the persuasive analysis set forth in *Cleaver* and *Davis,* and there is no basis for distinguishing this case from *Cleaver* or *Davis.* It is axiomatic that a parent's private interest in termination cases is greater than the parental interest in dependency proceedings, but it does not follow that an indigent parent is not constitutionally entitled to a determination of the necessity for appointed counsel in the particular dependency proceeding to which he or she is a party. At the outer reaches, the disposition in such proceedings can be a long-term deprivation of custody and an intervention in the parent-child relationship that differs only in name from the disposition in termination proceedings. We are bound by the federal constitutional analysis in *Lassiter,* and there is no logical basis for not applying that analysis to dependency proceedings as well as to termination cases.

However, there is a significant difference between the factors that can be considered in determining the need for

counsel in dependency cases, on the one hand, and termination cases on the other. In the latter, the nature of the parental interest and of the governmental interest are relatively constant and, generally, the only variable for the court to consider in deciding whether to appoint counsel is the extent of the "risk that the procedures used will lead to erroneous decisions." Conversely, the nature of the parental interest at stake in dependency proceedings can vary greatly. It is significant that *Cleaver* and *Davis* appear to contemplate that appointment of counsel will seldom be necessary when the possible disposition is something less than a long-term or open-ended separation of parent from child. *Cleaver* refers to a "substantial possibility of the loss of custody or prolonged separation from a child," 499 F2d at 945; *Davis* notes that "[t]he parental interest at stake certainly becomes greater as the deprivation approaches permanency." 714 F2d at 516.[5]

■ Trial judges should consider the following factors, along with others that may assume relevance in particular cases, in deciding whether to appoint counsel:

1. The nature and duration of the interference with the parent-child relationship that possibly could result from the proceeding;

2. The complexity of the issues and evidence, *e.g.*, the need to review sophisticated data or to cross-examine expert witnesses;

3. Whether the parent contests any of the allegations and the nature of the allegations that are contested: the underlying conduct charged, the opinions of experts and the like, on the higher end of the scale, versus inferences that can be drawn from admitted facts, on the lower end; and

4. The effect the facts found or the disposition in the proceeding may have on later proceedings or events, *e.g.*, termination of parental rights or criminal proceedings. *See Lassiter v. Department of Social Services, supra,* 452 US at 27, n 3.

---

[5] Conceivably, in some proceedings where the possible disposition is less grave, *e.g.*, short term deprivation of physical custody or retention of custody by the parents subject to ongoing court supervision, the appointment of counsel may be warranted if the complexity of the issues or the evidence makes the risk of an erroneous decision extremely high unless the parent is assisted by counsel.

■ The comparative weight to be given the enumerated factors and other factors the trial court considers will necessarily vary from case to case. We specifically endorse the recommendation in *Cleaver* that, when trial courts deny an indigent parent's request for appointed counsel, they should explain the bases for the denial to expedite the appellate court's task on review.

In the present case, all factors militate strongly in favor of the appointment of counsel. The consequence of the proceeding was an immediate loss of custody with a substantial possibility of a prolonged separation. The issues were quite complex. A meaningful examination of or response to the state's evidence of the risk of physical abuse would have been impossible without legal representation. The facts and the evidence supporting the findings were disputed. There is some possibility that the findings and disposition will affect mother's interests in future proceedings in this case and in ancillary proceedings.

■ The trial court erred by denying mother's request for appointed counsel. However, the error was harmless. Mother was capably represented by the attorney Legal Aid Service provided her. Although the denial of her request for counsel deprived mother of representation during preliminary proceedings, the plenary hearing was far and away the most relevant stage, and the quality of mother's representation at that hearing demonstrates that neither mother nor her attorney were hampered in their efforts to defend effectively by the fact that mother was not represented by counsel in the earlier phases.[6]

■ We therefore hold that the trial court's findings and disposition were correct and that the trial court erred, albeit harmlessly, by denying mother's request for court-appointed counsel. The remaining issue is whether the court also erred by denying mother's motion for attorney fees. We are unable to conclude that it did. ORS 419.498(2) provides:

---

[6] Mother's attorney made effective presentations, in the trial court and here, both in defending mother against the allegations of the petition and in arguing the constitutional issue. In *State ex rel Adult & Family Ser. v. Stoutt*, 57 Or App 303, 314, n 9, 644 P2d 1132, *rev den* 293 Or 801 (1982), *cert den* 461 US 928 (1983), we criticized—hypothetically—the different procedure of an attorney agreeing to represent a client on an ancillary constitutional issue without taking measures to assure representation on the merits of the case.

"(a)   If the child, the parent or guardian requests counsel but is without sufficient financial means to employ suitable counsel possessing skills and experience commensurate with the nature of the petition and the complexity of the case, the court shall appoint suitable counsel to represent the child. The court may appoint suitable counsel to represent the child in any case. Counsel appointed by the court shall be paid compensation determined, as provided in ORS 135.055, by the court.

"(b)   Where the court appoints counsel to represent the child, it may require the parent, if able, or guardian of the estate, if the estate is able, to pay compensation for counsel and reasonable expenses of investigation, preparation and presentation. The test of the parent's or estate's ability to pay such compensation and expenses shall be the same test as applied to appointment of counsel for defendants under ORS 135.050. The court's order of payment shall be enforceable in the same manner as an order of support under ORS 419.515.

"(c)   Where the court appoints counsel and the child, parent or guardian is without sufficient financial means to employ counsel, the compensation for counsel and reasonable expenses of investigation, preparation and presentation paid or incurred shall be allowed and paid as provided in ORS 135.055."

The statute requires payment of fees to attorneys *appointed* to represent a *child*. Mother's attorney was not appointed, and she did not represent a child. The Supreme Court stated in *Penrod/Brown v. Cupp,* 284 Or 417, 587 P2d 96 (1978):

"* * * Even when the appointment of counsel is itself constitutionally required, the court will not relieve counsel from the professional duty to render the required services without compensation if no law provides for public payment of such compensation. * * *" 284 Or at 419.

In *State v. Jamison, supra,* the parent's lawyer sought attorney fees for services *on appeal.* In rejecting the petition, the court stated:

"Unlike the circuit courts, which have been given general and equitable jurisdiction (ORS 419.474) and which may make provision for attorney fees in any case on behalf of a child (ORS 419.498), this court has no express authority to allow attorney fees in cases brought under ORS ch 419. * * *" 251 Or at 120.

In context, the court's *suggestion* that attorney fees for services in the circuit court can be awarded to counsel for parents is dictum, and we do not interpret that suggestion as discrete authority of a circuit court to award attorney fees pursuant to general equitable powers. The court's subsequent holding in *Penrod/Brown v. Cupp, supra,* clearly limits the award of attorney fees to instances where it is specifically authorized by statute.

Affirmed.