Argued and submitted October 12, 1988 reversed and remanded for new dispositional hearing June 14, decision vacated; petition for review dismissed and appeal dismissed by order November 9, 1989

In the Matter of Baby Boy Walen,
aka St. Stephen Giovanni, whose true name is
Shiviah Soloman Silvah, a Male Child.

STATE ex rel JUVENILE DEPARTMENT
OF LANE COUNTY et al,
*Respondents,*

*v.*

WALEN,
aka Elyzabeth Silvah,
*Appellant,*

*and*

DAVIDSON,
*Respondent.*

(87-327; CA A46712)

775 P2d 884

George W. Kelly, Eugene, argued the cause for appellant.

Christine Chute, Assistant Attorney General, Salem, argued the cause for respondents Juvenile Department of Lane County and Children's Services Division. With her on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

No appearance for respondent baby boy Walen.

No appearance for respondent Stephen Davidson.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

DEITS, J.

## DEITS, J.

Mother challenges a juvenile court order committing her child to the legal custody of Children's Services Division (CSD). She contends that the court erred in finding jurisdiction, in awarding custody to CSD and in refusing to allow mother's witnesses to testify at the dispositional hearing.

The child in this case was born in May, 1987, in a ditch along a highway between Eugene and Cougar Hot Springs. When paramedics arrived at the scene, they found mother and child in the back of a van, wrapped in a sheet. Mother did not want the assistance of the paramedics and would not allow them to examine the baby, even though she believed that the child was three months premature. She told them that she wanted to take the child to the hot springs and to bathe there with him, because she was "a kindred spirit with whales and porpoises," and she and her child needed to be in the water. The paramedics tried to talk her out of taking the baby to the hot springs, expressing concern that the water was not chlorinated and could cause infections in mother and baby, and that the hot water would not be healthy for such a young baby. Mother was determined to go to the hot springs and became increasingly agitated.

The paramedics decided that they could not leave mother, who seemed irrational and incapable of good judgment, and her newborn baby stranded on the rural roadside and tried to get her to come with them. When she resisted, they took the baby from her, cut the umbilical cord and restrained her. Mother and baby were taken to Sacred Heart General Hospital emergency room. At the hospital, both doctors who examined mother concluded that she was mentally disturbed. Dr. Johnson, who saw her in the emergency room, believed that she was schizophrenic. Dr. Friedrich, who conducted a mental examination of mother, agreed that she was either schizophrenic or suffering from manic depression. Friedrich concluded that her judgment was impaired, that she was delusional and that she was unable to care for herself or her child. He was afraid that she would "do something bizarre to herself." The baby was taken from her and mother was hospitalized for four days and then released to friends.

On August 4, 1987, a hearing was held, pursuant to ORS 419.500, to determine if the juvenile court should assume

jurisdiction of the child. At that hearing, Dr. Freedman, a psychologist, testified concerning mother's mental condition. He first saw mother in November, 1986, six months before the birth of her child. She apparently went to see him at the urging of friends to obtain a psychiatric evaluation in order to qualify for Social Security benefits. He concluded, at that time, that mother was either suffering from a bipolar disorder or a schizophrenic disorder and that it was fairly severe. Freedman testified that persons with schizophrenic disorders experience reality differently from others and may not recognize a dangerous situation. He stated that, although bipolar disorders are usually cyclical in nature, with periods where the person is seriously ill and others where the person is able to cope, mother apparently had been ill for many years with no periods of remission. He concluded that she urgently needed treatment. However, she was unwilling to obtain treatment. Mother did receive SSI disability benefits because of her mental illness.

Freedman next saw mother when CSD sent her to him for an evaluation after the birth of her child. He attempted to conduct a more in-depth evaluation, but mother was unable to cope with the testing involved and it had to be discontinued. Instead, he questioned mother about her life and her plans for her child. However, she was unable to focus on any subject without wandering off into unrelated topics. Freedman continued to believe that she suffered from a serious mental disorder and that she needed treatment. He believed that mother had difficulty with impulse control, suffered from delusions of grandeur and had no insight into her impact on her surroundings. He concluded that she was not capable of caring for a small child, and he recommended that she should not be permitted to visit the child unless accompanied by another adult.

Testimony was also received at the jurisdictional hearing from one of the paramedics involved in the birth, two friends of mother and mother.[1] Apparently, mother has been

---

[1] Before the hearing, mother sent the court a letter which also was made part of the record. A few excerpts follow:

"SCIENTIFIC DATA REPORT TO BE ENTERED INTO THE FACT FINDING HEARING REQUESTING PERMISSION TO BE BROUGHT INTO THE AWARENESS OF YOUR HONOR FOCUSING ATTENTION ON

unable to hold a job for many years because of her mental illness. She has been supported by friends and, recently, has lived on Social Security benefits. She had not had a permanent residence for many years. Instead, she has lived with friends or, as she was doing when her baby was born, in the back of a van. Just before the jurisdictional hearing, she obtained an apartment, purchased items for the care of the

THE COLLECTED KNOWLEDGE OF THE NATURAL BIRTHING PROCESS OF SAID MOTHER.

"GIVEN CONSIDERATION THAT THE BABE IN QUESTION IN THIS CASE IS MEANT TO BE NOURISHED BY THE MOTHER'S LIFE ENERGY CARRIED THROUGH THE UMBILICAL CORD FROM THE PLACENTA ORGAN IN AN EMRYONIC [sic] FLUID ENVIRONMENT, AND CONSIDERING THATT [sic] THE BABE WAS BORN RADIANLY [sic] HEALTHY, BREATHING, WITH GOOD LUNG CAPACITY, AND CONSIDERING THAT THE MOTHER ISSSERED [sic] AT THIS TIME DUE TO CSD-AMA INTERVENTION NEGLIGENT, DISTASTFUL [sic] TREATMENT OF SILVAH HAS RESULTED IN THE SEVERE DETERIORATION OF SEVERAL LAYERS OF SKIN AND SPIRITUAL MANSLAUGHTER OF THE MAN CHILD SHIVTIE NAZARITE OZ MOSEZMAN DANIEL LACK OF BEING BATHED IN CRYSTALLINE CLEAR H20. THE MOTHER, EDUCATED IN AN ENVIRONMENTAL SCIENCE INSTITUTE KNOWLAGABLY [sic] IN SOLAR SCIENCE TECHNOLOGY, HAS DESIGNED ARCHITECUALLY [sic] FOR THE BABE A SOLAR AGRICOLARIUM, BOTANICAL GARDEN SWIMMING POOL CONCERT PERFORMING ARTS THEATRE COMPLEX, INCORPORATING A RECENTLY DEVELOPED SOLAR ELECTRICAL COLLECTOR DESIGN HEATING AND DISTILLING WATER PROVIDING FOR THE FUTURE CHILDREN OF AMERICA, WITH LOVE AND REVERENCE TO BANJAMEN [sic] FRANKLIN AND THE FOUNDING FATHERS OF THE UNITED STATES OF AMERICA. THROUGH LCC, THE UNIVERSITY SYSTEM, AND THE NATIONAL SCIENCE FOUNDATION HISTORICAL SOCIETY, WILLIAM LOREN FHUNNING'S SWISS BANKS AND QUEEN ISABELLA.

"* * * * *

"SHIVIAH SILVAH'S FATHER IS A GENTLEMAN SAINTED MUSICIAN. CONTRARY TO THE BELIEF THAT ALL MEN ARE CREATED EQUAL, AVERAGE MEMBERS OF SOCIETY ARE NOT POTENTIALLY QUALIFIED TO TOUCH THE BODY OR BE THE LOVER OF RUPUNZULYNN ELYZABETH SILVAH. FOLLOWING THIS LINE OF THOUGHT, THE BABE CONCEIVED IN LOVE THROUGH THE WOMB OF RUPUNZULYNN ELYZABETH SYLVAH WITH SAINT STEVEN GIOVANNI IS TOO VALUABLE, FRAGILE, AND VULNERABLE TO THE IMPURITIES AND ROUGH INSENSITTIVY [sic] OF PEOPLE OF THE NATURE OF SACRED HEART AMBULANCE PHARMEDICS [sic]. THEREFORE, I, RUEBECKA ELYZABETH SILVAH WALEN GIOVANNI AM FILING A LAW SUIT [sic] THIS FOURTH DAY OF JUNE PROTECTING MY PEROGATIVE [sic] DEFENDING MY LIVING BODY TEMPLE AS WELL AS MY SON SHIVIAH AGAINST PHYSICAL VIOLENT AGRESSION [sic] NOT STEMMING FROM PURE AND PERFECT LOVE."

The letter was signed: "RUPUNZULYNN RUEBECKAH ELYZABETH SILVAH WALE BAKER RHUNNING JAI BEAU D' RE COUX GIOVANNI DAVIDSON ANDERSON."

baby and began therapy with a psychologist. According to all the witnesses, mother was clean and healthy, despite her unusual manner of dress.

On August 26, 1987, the trial court found that it had jurisdiction over the child and continued the matter for disposition. After the court found jurisdiction, CSD implemented a parenting program and scheduled regular visitation with the child, one visit a week in the CSD office that focused on parent training and one a week in mother's home. The visits went very poorly. Mother was either unwilling or unable to follow instructions concerning parenting. The child apparently was upset at the visits and remained upset for days after them, crying and refusing to eat.

On November 10, 1987, a dispositional hearing was held. At that time, the trial court refused to hear testimony from three witnesses subpenaed by mother. The court did allow mother's attorney to make a statement, summarizing the testimony that the witnesses would have given. Generally, they would have testified about their observations of how mother interacted with the child during the weekly visits: that she would feed and change him, play with him and bring toys. The court concluded that the child should be in custody of CSD and recommended that the child be placed in foster care.

**1.** Mother assigns as error the trial court's determination that it had jurisdiction over the child. A juvenile court may take jurisdiction when the child is "dependent for care and support on a public * * * agency that needs the services of the court in planning for the best interest of the [child]." ORS 419.476(1)(d). Proof of facts supporting jurisdiction must be established by a preponderance of the evidence. ORS 419.500(1). The petition by the state alleged that the child was dependent for care and support on a public child care agency, CSD, because his mother was emotionally unstable and unable to parent him adequately and the father's circumstances and whereabouts were currently unknown. All of the mental health experts who examined mother concluded that she has a severe mental disorder. The evidence of her behavior supports their conclusion. On *de novo* review, we find that mother was unable to parent the child adequately at the time of the hearing and that the child was dependent on CSD for

care and support. The court correctly found the child to be within the jurisdiction of the juvenile court.

**2.** Mother also argues that the trial court erred in its refusal to allow witnesses to testify on her behalf in the dispositional phase of the juvenile court process.[2] She contends that that violated her due process rights under the Fourteenth Amendment. A juvenile court proceeding to establish jurisdiction involves two phases—an adjudicative phase to determine jurisdiction and a dispositional phase. ORS 419.500; ORS 419.507. Mother was given a full opportunity to present evidence at the adjudicative phase. However, her presentation of evidence at the dispositional hearing was severely limited.

The dispositional phase of a juvenile proceeding is less formal than the adjudicative phase. For example, the Oregon Evidence Code does not apply. *State ex rel Children's Serv. Div. v. Page,* 66 Or App 535, 538, 674 P2d 1196 n 3, (1984); ORS 419.500(2);[3] OEC 101(4)(h). Nonetheless, due process requires that a parent be given a meaningful opportunity to be heard by submitting testimony herself and by witnesses. A parent's interest in a dependency proceeding, and in particular in the disposition of the child, although perhaps not as great as her interest in a termination proceeding, nevertheless, is very significant. *State ex rel Juv. Dept. v. Grannis,* 67 Or App 565, 571-73, 680 P2d 660 (1984). A court, in its discretion, may place reasonable limitations on the presentation of evidence at the dispositional phase of the proceeding but refusing to allow mother to present any witnesses deprived her of a meaningful opportunity to be heard.[4]

Reversed and remanded for a new dispositional hearing.

---

[2] In addition, mother argues that ORS 419.498(3), which makes subpenas available to a parent in a juvenile court proceeding, gives her an absolute right to call witnesses in all phases of a juvenile court proceeding. We disagree. Although the statute does give a parent access to subpenas, it does not, in itself, create a right to present testimony.

[3] ORS 419.500(2) provides:

"For the purpose of determining proper disposition of the child, testimony, reports or other material relating to the child's mental, physical and social history and prognosis *may* be received without regard to their competency or relevancy under the rules of evidence." (Emphasis supplied.)

[4] Mother also argues that the trial court erred in placing the child in foster care. However, in view of our disposition of the case, we do not address that issue.