Argued and submitted May 8, reversed and remanded with instructions
August 13, 2003

In the Matter of
C. K., a Minor Child.

STATE ex rel DEPARTMENT
OF HUMAN SERVICES,
*Appellant,*

*v.*

Leonard KAMPS,
*Respondent.*

In the Matter of
A. K., a Minor Child.

STATE ex rel DEPARTMENT
OF HUMAN SERVICES,
*Appellant,*

*v.*

Leonard KAMPS
and Jennifer Herrera,
*Respondents.*

013741J (Petition Nos. 013741 and 013743);
A116451 (Control) and A116452

74 P3d 1123

Laura S. Anderson argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

No appearance for respondent Leonard Kamps.

No appearance for respondent Jennifer Herrera.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

## LINDER, J.

In this appeal, the Department of Human Services (DHS) challenges the juvenile court's dismissal of two petitions seeking juvenile dependency jurisdiction over two children, C. K. and A. K., because their condition and circumstances endanger their welfare. *See* ORS 419B.100(1)(c). On *de novo* review, ORS 419A.200(6)(b), we conclude that the juvenile court erred in dismissing the petitions and reverse.

When the petitions were filed, C. K. was 15 months old and lived with his mother, Workman (mother), his maternal grandmother, Spicer, and Spicer's three other children. C. K. visited his father, Kamps (father), approximately every other weekend, pursuant to court order. Father lives with his girlfriend, Herrera. A. K., who was six months old at the time of filing, is the child of father and Herrera and lived with them.

On July 31, C. K.'s pediatrician discovered that C. K.'s right arm was broken in six to eight places[1] and that he had 20 small bruises on his face, 17 of which were on the right side—injuries that were consistent with child abuse. Thereafter, the pediatrician notified the State Office of Services for Children and Families (now DHS), which in turn filed petitions for dependency jurisdiction over C. K. and A. K. When DHS filed the petitions, it was unable to determine who caused C. K.'s injuries and precisely when the injuries occurred. For that reason, it included in the petitions allegations relating to three of the adults who were primarily responsible for C. K.—mother, father, and Herrera. Mother stipulated to the juvenile court's jurisdiction over C. K. after the petitions were filed, which led DHS to dismiss mother from this appeal. Accordingly, we focus on the facts and allegations relating to father and Herrera. As relevant to this appeal, the petition for jurisdiction over C. K. alleged that

---

[1] Doctors were unable to determine the exact number of fractures because it was unclear whether some of what appeared to be distinct fractures were actually compound fractures.

"[C. K.] is within the jurisdiction of the Court by reason of the following facts: ORS 419B.100(1) Conditions and circumstances of [C. K.] are such to endanger [his] welfare, to-wit:

"a. [C. K.] has unexplained injuries consistent with child abuse which places [him] in direct threat of harm.

"* * * * *

"d. [C. K.] has sustained injuries consistent with child abuse while in the care of [father], which places [C. K.] at risk.

"e. [Father] has failed to provide [C. K.] with the care, guidance, and protection necessary for the physical, emotional, and mental well-being of [C. K.], placing [C. K.] at risk."

Although there was no evidence that A. K. had suffered any injuries, DHS filed the petition for A. K. based on C. K.'s injuries. That petition alleged:

"[A. K.] is within the jurisdiction of the Court by reason of the following facts: ORS 419B.100(1) Conditions and circumstances of [A. K.] are such to endanger [his] welfare, to-wit:

"a. [Father] has another child who has sustained serious physical injuries consistent with child abuse which places [A. K.] at risk.

"b. [A. K.'s] mother, Jennifer Herrera, has provided care for a child who has sustained serious physical injuries consistent with child abuse which places [A. K.] at risk."

At the consolidated hearing on the petitions, mother testified that the only times she saw injuries to C. K. were when he returned from visits with father and that she noticed bruises and markings on C. K. "[b]asically * * * every other weekend when he returned from [father's]." A number of witnesses echoed mother's concern. Vince Ferguson, mother's ex-boyfriend and C. K.'s babysitter, testified that he saw bruises on C. K.'s face and arm after C. K. returned from a visit with father. Jane Stallons, one of mother's teachers at an alternative high school, testified that mother often brought C. K. to school with her and that

"I would dread early in the week * * * to see [mother] and [C. K.] show up, because it seems like when C. K. would come after the long weekend that he would have injuries on him that I would witness. Bruises on his head, his ears would be red as if they were pulled. He would be sore or lethargic. And this was pretty—to the point where I would kind of dread having [mother] come in early in the week because I knew there would be something that I'd have to be concerned about[.]"

Stallons testified that she noticed injuries to C. K. approximately every other week and that C. K.'s condition would improve as the week went on.

Dr. Burns, C. K.'s pediatrician, testified about his examinations of C. K. from February through July. According to Burns, Mother expressed to him her concern that C. K. was returning from his visits with father "damaged," and Burns's impression was that when mother brought C. K. in, she was genuinely concerned about his health. In response to mother's concerns that C. K. was being abused while he visited father, Burns testified that he told her "that it was important for her to do her job in protecting her child, which I thought she was trying to do. But to not let these other factors [hostilities between the separated parents] come into play because everything gets dirty when you get into this."

In February, mother took C. K. to see Burns the day after he returned from a visit with father, concerned about bruises on his ears. Burns noted the presence of bruises and that C. K.'s earlobe was torn and stretched. Based on the color of the bruises, Burns estimated that the injury was one to five days old. Burns thought the injuries were "suspicious," as though someone had pinched or pulled C. K.'s earlobes, but he did not report the incident as child abuse.

In April, mother took C. K. to Burns, complaining of pain in C. K.'s right arm since he returned from a weekend visit with father. X-rays revealed a "questionable abnormality" in C. K.'s wrist, which might have been a fracture or some other injury.

In July, Burns examined C. K. three times. The first was on July 10, when mother brought C. K. in because the tops and backs of his ears were bleeding. Burns diagnosed

the problem as a skin condition with a secondary infection and prescribed antibiotics. At a follow-up visit a week later, Burns noted that C. K.'s ears had improved considerably and noticed nothing abnormal during the visit. Burns testified that he examined C. K. with a heightened awareness of the potential for abuse.

On July 31, a Tuesday, C. K.'s maternal grandmother Spicer took C. K. to see Burns, explaining that C. K. had been "cranky" since he returned on Monday from his weekend visit with father.[2] During that appointment, Burns counted 20 bruises on C. K.'s face that he believed had been inflicted intentionally. According to Burns, the color of the bruises indicated that they were approximately 9 or 10 days old, plus or minus two days, cautioning that "you should stick a little wiggle room in there because children aren't * * * that simple," and that "there should be some concern about the exact number of days that especially small bruises resolve in children." Because Burns also noticed that C. K. was experiencing pain in his right arm, Burns ordered x-rays, which revealed that the arm was fractured in several places. Burns concluded from the bruising and fractures that C. K. "was a victim of at least inadequate and inappropriate supervision, and most probably was the victim of some form of physical abuse."

As to when the fractures occurred, Dr. Bear, a radiologist, testified that three of C. K.'s fractures appeared older than the rest; the older fractures were estimated at one to two weeks old. Bear was unable to date the fractures with greater specificity, stating that it would be "impossible" to say that the fractures occurred "on a particular weekend or day of the week."

Mother testified that she had seen the bruises on C. K.'s face and noticed that C. K. had been favoring his arm after his July 30 visit with father and that C. K. had difficulty sleeping the night after he returned from his visit with father. She also testified that, before then, C. K. seemed to be using his arm normally.

---

[2] According to Spicer, she took C. K. to Burns because mother was unable to take time off of work.

Both Herrera and father testified that they did not have C. K. on the weekend of July 22, the week before Burns discovered the fractures and bruises that led to the petitions, because she and father worked that weekend. Mother testified, however, that father did have C. K. on the weekend of July 22, a fact that she recalled because she worked that weekend.

In its findings of fact, the juvenile court concluded that the evidence presented at the hearing established only that C. K. suffered serious physical injury, that father is C. K.'s father, and that Herrera provided care to C. K. The juvenile court made no explicit credibility findings but did note that mother "dutifully took [C. K.] to her pediatrician when she suspected abuse." The juvenile court acknowledged that "the proof substantiates abuse" but dismissed the petitions because neither the allegations in the petitions nor the evidence presented at the hearing established *who caused* C. K.'s injuries. The juvenile court concluded that, given the absence of persuasive proof of causation, dependency jurisdiction over C. K. and A. K. was not warranted.

The petitions for jurisdiction alleged that the court had dependency jurisdiction over the children because their "condition or circumstances are such as to endanger [their] welfare." ORS 419B.100(1)(c).[3] The key inquiry in determining whether "condition or circumstances" jurisdiction is warranted is whether, under the totality of the circumstances, "there is a reasonable likelihood of harm to the welfare of the child[.]" *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993).[4] There is no requirement that the state

---

[3] ORS 419B.100(1) provides, in relevant part:

"[T]he juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:

"* * * * *

"(c) Whose condition or circumstances are such as to endanger the welfare of the person or of others[.]"

[4] *Smith* dealt with *former* ORS 419.476(1)(c) (1991), *repealed by* Or Laws 1993, ch 33, § 373, a statute that, at least as relevant to this case, was identical in substance to ORS 419B.100(1)(c). *Former* ORS 419.476(1) provided:

"The juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:

"* * * * *

establish causation to meet that standard. In fact, ORS 419B.100(2) states that "[t]he court shall have jurisdiction under subsection (1) of this section even though the child is receiving adequate care from the person having physical custody of the child." It is the *child's* condition and circumstances that are the focus of the jurisdictional inquiry. In determining whether it has jurisdiction, the court's objective is to determine whether the child needs the court's protection, not to determine the nature or extent of that protection. *See State ex rel Juv. Dept. v. Brammer*, 133 Or App 544, 549 n 5, 892 P2d 720, *rev den*, 321 Or 268 (1995) ("Our decision merely places the children under the protection of the juvenile court. Whether or not they remain in the home will be determined in a subsequent proceeding."); *see also State ex rel Juv. Dept. v. Jordan*, 36 Or App 817, 820, 585 P2d 753 (1978) ("Whether * * * conditions and circumstances are attributable to the mother or the father matters not for jurisdictional purposes."). An endangering condition or circumstance need not involve the child directly. *Smith*, 316 Or at 653. A child may be subject to juvenile court jurisdiction if there is evidence of abuse of any child in the child's home. *Brammer*, 133 Or App at 549; *see also State ex rel Juv. Dept. v. Grannis*, 67 Or App 565, 569, 680 P2d 660 (1984).

With those principles in mind, we readily conclude that the juvenile court erred in dismissing the petitions. The evidence presented at the hearing established that C. K. was severely abused, a "condition or circumstance" that endangers his safety. That is sufficient for dependency jurisdiction. The state's failure to prove causation, or to allege it in the dependency petitions, did not preclude juvenile court jurisdiction over C. K.

That conclusion also warrants jurisdiction over A. K. Unlike the juvenile court, we are convinced on *de novo* review that the evidence established by a preponderance that C. K. suffered his injuries while *in the care* of father and Herrera. Mother's testimony that C. K. came back "damaged" from his visits with father was corroborated by Stallons's testimony that she noticed injuries to C. K. after approximately every

---

"(c) Whose behavior, condition or circumstances are such as to endanger the welfare of the person or the welfare of others[.]"

other weekend and that he improved during the course of the week while in mother's care. Mother's testimony is also supported by her history of taking C. K. to Burns, the pediatrician, when she noticed injuries to C. K. after he returned from visits with father; Burns testified that mother seemed genuinely concerned for C. K.'s health during C. K.'s appointments. In addition, the juvenile court apparently found mother's testimony credible, stating in its findings of fact that mother "dutifully took [C. K.] to her pediatrician when she suspected abuse. In fact, there is some suggestion that Dr. Burns admonished her that she should be circumspect in making abuse reports as they subjected everyone to scrutiny."

To be sure, the evidence presented at the hearing did not establish that father or Herrera caused C. K.'s injuries. Burns's testimony relating to the age of C. K.'s bruises and Bear's (the radiologist's) inability to determine precisely when C. K.'s arm was broken demonstrate that, on this record, the timing of the injuries cannot be pinpointed with accuracy, and thus the person who inflicted them cannot be identified conclusively. But such findings are unnecessary in determining juvenile court jurisdiction over the children. *See Brammer*, 133 Or App at 549 n 5. We are satisfied, based on the facts outlined, that the evidence established that C. K. was injured while in father's and Herrera's care.

In light of our conclusion that C. K. suffered his injuries while in the care of father and Herrera, it follows that there is a reasonable likelihood that A. K. could suffer harm in the future as well. The fact that A. K. has not yet suffered injuries himself, or that the evidence does not establish who caused C. K.'s injuries, is of no consequence to that determination. *See id.* at 549.

Reversed and remanded with instructions to enter judgment finding that C. K. and A. K. are within the jurisdiction of the juvenile court.