Argued and submitted June 9, judgment establishing dependency jurisdiction over
T and J reversed and over K based on paragraph D of petition reversed;
otherwise affirmed October 19, 2005

In the Matter of
K. Shugars, T. Shugars and J. Shugars,
Minor Children.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES,
*Respondent,*

*v.*

Crystal SHUGARS
and Edgar Shugars,
*Appellants.*

0000739JV1, 0000739JV2, 0000739JV3; A124356

121 P3d 702

James J. Spindor argued the cause and filed the brief for appellant Crystal Shugars.

James A. Palmer argued the cause and filed the brief for appellant Edgar Shugars.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Haselton, Judge, and Deits, Judge pro tempore.

HASELTON, J.

## HASELTON, J.

Mother and father appeal from a judgment, entered in March 2004, that established juvenile dependency jurisdiction over their three children, K, T, and J. They contend that the Department of Human Services (DHS) failed to prove that any of the children's "condition[s] or circumstances are such as to endanger the welfare of the person or of others," ORS 419B.100(1)(c), as alleged in the petition. On *de novo* review, ORS 419A.200(6)(b), we agree with the trial court's conclusion that DHS presented sufficient evidence that the oldest child, K, should be subject to dependency jurisdiction, albeit on some, but not all, of the grounds alleged. Conversely, we conclude that DHS failed to prove that the two younger children, T and J, should be subject to dependency jurisdiction on any basis. Accordingly, we affirm in part and reverse in part.

K was born in March 1995. When K was about a year old, parents received some parent training services from DHS. Although K received regular medical care throughout her infancy and generally was healthy, when she was about a year old, K was diagnosed with serious vision problems, requiring that she wear glasses. K resisted wearing the glasses and often broke them. As a result, she often went without her glasses for weeks at a time, as parents had difficulty getting insurance coverage for replacement glasses.

By the time K was three years old, mother observed that K had developed behavior problems. The family came to DHS's attention again in April 1999, just after K's fourth birthday, when a friend of the family was being investigated for sexual abuse. Mother told the DHS worker that K had never been alone with that individual. In early 2000, K was evaluated by the CARES program in Portland after she had reported difficulty urinating and her physician had discovered a sore on her genitals. CARES found no evidence of sexual abuse.

T was born in October 2000. Mother had received regular prenatal care throughout the pregnancy. Although T was born at full term, he weighed only five pounds, six ounces, due to a condition known as intrauterine growth

retardation. Over the following two months, he gained approximately two pounds, which was the amount that his physician considered to be desirable. T was cared for primarily by mother and, when mother was at work, by his maternal aunt and grandmother. Although T was brought in for regular pediatric checkups, he was still in the lowest five percent of infants in terms of weight.

In November 2000, shortly after T's birth, K was referred to the school counselor because of behavior problems in kindergarten, including attention deficit, failure to follow instructions, and aggression. The school counselor noted that K was unkempt and dirty, and frequently smelled of cat urine.

In early December 2000, T's physician hospitalized him when he failed to gain any weight for more than a week, diagnosing failure to thrive. Various witnesses observed that parents were not adept at feeding T, that they would sometimes prop a bottle next to him and expect him to be able to eat, and that they did not always support his head properly. Hospital staff noted that T's sucking was somewhat impaired and changed the nipple on T's bottle to allow him to suck better. T began gaining appropriate amounts of weight. Ultimately, medical staff determined that T had a urinary tract infection.

Given those circumstances, following a shelter hearing on December 19, the juvenile court granted DHS temporary custody of both T and K for 60 days. When T was discharged from the hospital, DHS placed him and K into foster care.

While the children were in foster care, a DHS parent trainer worked with mother on her skills at feeding T. A risk assessment performed by a social worker concluded that parents were capable of providing minimally adequate housing, heat, food, transportation, and medical services for the children, but the social worker was concerned that mother and father lacked empathy for the children. Most of those concerns related to father, whom DHS characterized as rude and domineering. Although parents attended parenting classes while the children were in foster care, father clashed on occasion with the teacher of the parenting class and told the class

at one point that he had beaten up his mother. The teacher was concerned that father had problems dealing with anger.

In May 2001, following an extensive hearing, the court declined to take jurisdiction over the children. The children were returned to parents, who rejected further services from DHS. At that point, K had two pairs of glasses, one of which was broken. Throughout her time in foster care, K's problems in kindergarten had continued.

In July 2001, K began receiving therapy at a local youth agency because she was exhibiting symptoms of attention deficit disorder and a bipolar disorder. The therapist worked with mother and father, with limited success, to implement behavioral strategies. Mother and father did, however, work with K's physician to try various medications to address her problems. K's treating physician prescribed Ritalin for a number of months, but without positive results.

K's behavioral problems at school became worse during the first grade, beginning in the fall of 2001. Her attendance was poor, and she often did not complete homework. Parents reported to the counselor that K had tantrums and resisted doing her schoolwork. The school counselor acknowledged that parents were cooperative and understood that K had significant problems, but the counselor did not feel that mother and father were following through with sufficient counseling and treatment for K. K continued to come to school smelling of cat urine and would occasionally be sent home due to her odor. In November 2001, K's treating physician took her off Ritalin and prescribed Adderall. Mother did not get that prescription filled for approximately three weeks.

In January 2002, the youngest child, J, was born. J was of normal weight at birth and received regular medical check-ups. Like T, he gained weight slowly. Shortly after J's birth, T became ill with an upper respiratory tract infection and lost a significant amount of weight. Mother advised T's physician that T's appetite was poor, and the physician advised mother to provide T with more nutritious foods. As the infection resolved, T regained the lost weight.

K did not respond positively to the Adderall, and, in April 2002, her treating physician prescribed a new medication, Tenex. After K started second grade in the fall of 2002, her problem behaviors in school escalated. K had extreme mood swings; she was absent often; she seldom completed her homework; she stole items at school; and she was suspended for fighting, pinching, and pushing. After the school placed K on a half-day schedule, parents consistently failed to pick her up on time. The school counselor remained concerned that mother and father were not obtaining sufficient counseling for K.

Near the beginning of the 2002-03 school year, at the suggestion of K's therapist, K's treating physician prescribed Depakote to treat her bipolar symptoms. Mother reported to K's physician that K's behavior problems were worse after taking Depakote. In approximately December 2002, parents stopped giving the Depakote to K. A psychological assessment of K performed around that time indicated that she had attention deficit hyperactivity disorder, an adjustment disorder, oppositional and defiant behavior, and strong features of mania and depression typical of a bipolar disorder. K's treating physician and, later, her psychiatrist noted that K reported hearing voices.

Parents worked with K's therapist through May 2003 to address K's behavior problems. The therapist was concerned that parents' home was chaotic, that parents had too many cats, that mother slept while the children were awake, and that mother did not make breakfast for the children. The therapist reviewed parenting skills with mother and father, including feeding and hygiene. According to the therapist, during that time, K became calmer and more attentive, and mother and father improved their parenting skills somewhat. Parents failed to follow through, however, with tracking K's moods on a chart, as requested by treatment providers. In June 2003, K was referred to a psychiatrist who recommended that the drug Abilify be prescribed for K. However, after administering that initial prescription, parents may have let nearly a month lapse before refilling it.

In August 2003, DHS workers visited parents' home for reasons not disclosed on this record and noted that K was

not wearing her glasses. Mother stated that K had broken them and that they needed to be repaired.

The catalyst for the petition that led to the trial court's jurisdictional order occurred on September 26, 2003. On that day, DHS personnel received a report that parents had hit T and that T had a bruise on his forehead. Earlier that afternoon, father had taken T to his treating physician for an upper respiratory tract infection, but no injuries had been noted by medical staff during that visit—indeed, the physician described T as "well developed and well nourished."

In all events, when a DHS worker subsequently went to the home to investigate, father denied that T was injured and refused to permit the worker to see the children. The worker then obtained a protective custody order and returned to the residence. Father then released T and J to the DHS worker in compliance with the court order. The worker observed what he described as a slight redness and swelling on T's forehead and took T and J into custody. The worker later observed a minor bruise on T's leg, as well. Father did not know how T had sustained any injuries.

Father informed the worker that K was at a friend's house. When the worker went to the friend's house, the friend's father refused to release K to anyone other than a parent. The friend's father then contacted father by telephone. Father could hear K crying because she did not want to return to foster care.

Father then drove to the friend's house. When father arrived, the friend walked out with K, who was crying so hard that she was having trouble articulating words. Father—over the DHS worker's objections—put K in his van. When the DHS worker warned father that he "was potentially making the situation far worse than it already was" and that father was "just going to get himself in more trouble," father pulled out a pair of handcuffs, waved them at the DHS worker, and said, "We can do this the easy way or the hard way." According to father, "I was trying to get my daughter to a safe place," *viz.*, her godparents' home.

After father drove away, the DHS worker called 9-1-1, and a police officer and the DHS worker pursued father's van. The officer did not observe father commit any traffic infractions. However, after the officer activated sirens and overhead lights, father failed to pull over for about a half mile. Several other police officers then arrived, approached the van, and performed a "high-risk" stop, which entails approaching a vehicle with guns drawn and ordering the driver to exit the vehicle with hands visible. Father followed the officers' directions and, at their command, lay spread-eagle on the pavement and was then handcuffed and arrested. K, who was hysterical after seeing her father's arrest,[1] was taken into custody by DHS workers. Father subsequently told one of the officers that "he didn't want to see this girl get hurt" and "just wanted to take her to a safe place."

On September 28, 2003, mother met with a DHS worker and denied any knowledge of how T had sustained the slight swelling on his forehead or the bruise on his leg. All three children were taken to their regular physician within days of being placed in foster care, and, although K and J were found to have a minor viral illness, none of the children was observed to have any injuries.

On September, 29, 2003, DHS filed a petition for jurisdiction over the three children, alleging:

"A.   On or around 09-26-03, the child, [T], had an unexplained injury in the form of a bruise and swelling to his forehead. This condition places the children, [K], [T], and [J], under a threat of harm.

"B.   The children, [K], [T], and [J], have been victims of neglect in that the parents, Edgar and Crystal Shugars, have failed to provide appropriate and consistent medical

---

[1] On cross-examination by father's counsel, the DHS worker gave the following testimony:

"Q.  Hadn't [K] just seen her father physically removed from the van, thrown to the ground by police officers and handcuffed?

"A.  That's true.

"Q.  And wouldn't it be reasonable that any child who would have observed that happening to their parent would be hysterical, especially a nine year old?

"A.  I would think so."

treatment for the children. This condition places the children under a threat of harm.

"C.   On or around 09-26-03, the father, Edgar Shugars, exposed the child, [K], to emotional abuse by behaving irrationally and involving her in a volatile situation in which he took [K] in violation of a court order, eluded police while driving recklessly with her in the car, and refused to pull the car over until the police had him surrounded. Mr. Shugars refused to exit the vehicle with [K] and the police were forced to extract him from the vehicle at gunpoint while [K] was present. This condition places the children under a threat of harm for further emotional abuse.

"D.   The parents, Edgar and Crystal Shugars, have a history of involvement with DHS/Child Welfare due to issues of neglect and threat of harm. DHS/Child Welfare has offered numerous remedial services to the family, including Intensive Home Based Services which the family completed, however, most services offered have been refused by Mr. and Mrs. Shugars and they continue to engage in behaviors that are neglectful to the children and place the children under a threat of harm."

The hearing on the petition occurred over three days in March 2004. DHS introduced evidence that, throughout their lives, the children exhibited poor behavior and smelled of cat urine when brought to their treating physician's office by mother. DHS also introduced evidence that, over the course of many years, K regularly broke her glasses, sometimes deliberately, and that parents sometimes went for weeks before getting them repaired or replaced. All parties agreed that the children played roughly with one another and often sustained minor injuries during this play—and that that had occurred when the children were in foster care as well as in parents' care.

DHS also introduced evidence that, after being placed in foster care following the September 2003 incident, K's hygiene and self-esteem had improved, as had her school performance. After entering foster care, T and J had improved their play skills, and they had improved their language skills after receiving early intervention services.

The trial court determined that the state had not established the allegation of paragraph A of the petition,

regarding the alleged injury to T on September 26, 2003. Nevertheless, the court concluded that it would take jurisdiction over all of the children, based on the other three paragraphs of the petition.

Mother and father both appeal, arguing that the trial court erred in establishing jurisdiction over the children.[2] DHS responds primarily by first focusing on K's situation and then asserting that, if DHS establishes evidence of harm as to any child, it justifies jurisdiction over all the children in the home. *See, e.g., State ex rel Juv. Dept. v. Brammer*, 133 Or App 544, 549, 892 P2d 720, *rev den*, 321 Or 268 (1995) (a child may be removed from an abusive environment based on evidence of abuse of any child). As explained below, we conclude that the trial court properly assumed jurisdiction over K with respect to the allegations of paragraphs B and C of the petition. However, and contrary to the state's assumption, the "harm to one child means a risk to the others" axiom is not absolute and immutable. Rather, the application of that principle varies circumstantially. Here, we conclude that, given the particularized nature of K's condition and circumstances, the concerns that warrant the exercise of dependency jurisdiction over K do not support the exercise of jurisdiction over her two younger brothers.

We begin with two overarching observations. First, although this matter was precipitated by the alleged injury to T on September 26, 2003, DHS introduced no credible evidence that either parent had caused any injury to T. Indeed, there is no evidence that DHS subsequently sought medical treatment for T for the supposed injury.

Second, we reject parents' suggestion that, in evaluating the evidence supporting the petition's allegations, we are limited to considering evidence of the circumstances and conduct occurring *after* the 2001 hearing at which the court declined to take jurisdiction over the children. That is, parents contend that we cannot consider evidence of circumstances and conditions occurring before April 2001. Parents are incorrect. Although the court's unappealed 2001 order

---

[2] Although mother and father have filed separate briefs, we address their arguments together as they are essentially similar.

establishes that the evidence presented at that hearing was insufficient to establish jurisdiction *at that point in time*, that order certainly does not mean that evidence of parents' conduct and children's circumstances up to that time, coupled with evidence of subsequent conduct and circumstances, could never be relevant to a later dependency determination.

■■  We turn, then, to paragraph B, which alleges that parents "failed to provide appropriate and consistent medical treatment for the children." "Treatment," in this context, includes both obtaining appropriate advice and assistance of medical professionals, as well as then implementing or following through on that advice or assistance. Thus, for example, if a parent took a child to a physician but then unreasonably failed to act in accordance with the physician's advice, that failure would fall within the scope of paragraph B.

Here, parents frequently sought the advice and assistance of medical professionals for all three children—and had done so throughout their lives. Although the evidence shows that, on several occasions, appointments were canceled, rescheduled, or simply missed, there is no evidence that parents failed to seek medical care in a timely manner for any of the children to address any specific physical or mental problem or that any of the children's health suffered as a result of missed or rescheduled appointments. Thus, the evidence of canceled and missed appointments may speak to parents' generally chaotic lifestyle, but it does not demonstrate an actionable failure to provide treatment.

■  Conversely—with respect to K—there is cogent and persuasive evidence of parents' failure to follow through on medical advice. For example, K had, and has, special needs that require careful and consistent follow-through with psychological and psychiatric treatment. As noted, K was diagnosed with both attention deficit and bipolar disorders and exhibited behavior problems from a very early age. Although DHS emphasizes that, on several occasions, parents discontinued medications without first consulting K's physician, we place less emphasis on that point, given that the evidence demonstrated that the medications at issue were not working and that parents sought new medications. Still, of substantial concern is that parents failed to follow through on advice

given by K's therapist concerning tracking of K's moods, and also failed to follow through on advice on how to address some of K's ongoing behavior problems. We conclude that parents' persistent failure in those respects constituted neglect of a medical need sufficient to warrant the imposition of dependency jurisdiction.

In contrast to K's circumstances, there is no evidence that parents ever failed to follow through on any medical advice concerning J—or, indeed, that J has ever had any serious medical issues at all.

Nor is there any evidence of any "failure to follow through"-related medical neglect of T. As noted, T was extremely small at birth, due to intrauterine growth retardation. He steadily gained weight for two months while in parents' care, then ceased gaining weight for approximately a week and was hospitalized for failure to thrive. At that point, parents received medical advice on how to properly hold T during feeding, and what type of nipple to put on his bottle. There is no evidence that parents failed to heed that advice.

Approximately a year later, T lost a significant amount of weight when he was suffering from a viral infection. Mother promptly sought medical treatment for T and received advice from the physician on how to provide better nutrition for T. The record is devoid of any evidence that mother failed to follow that advice—indeed, because T regained the lost weight, it may reasonably be inferred that mother did, in fact, follow that advice. Finally, we note that, on the same day that DHS later took the children into custody, T's physician described T as "well developed and well nourished." Given that evidence, we conclude that DHS did not prove its allegation in paragraph B that parents failed to provide appropriate and consistent medical treatment for T and J.

■    Thus, the question becomes whether, notwithstanding the lack of any evidence of medical neglect of T and J, parents' inability to meet K's medical needs, as described above, provides a basis for juvenile court jurisdiction over T and J. We conclude that it does not.

The state invokes two decisions for the proposition that evidence sufficient to establish jurisdiction as to one child suffices as to the other children in the household. *See State ex rel Juv. Dept. v. Smith*, 316 Or 646, 853 P2d 282 (1993); *Brammer*, 133 Or App 544. Those cases are materially distinguishable.

In *Smith*, the court considered whether evidence that a father had sexually abused a 6-year-old boy's 12-year-old aunt was sufficient to establish "condition or circumstances * * * such as to endanger the child's welfare." The court concluded:

> "[T]he intent of the legislature in enacting ORS 419.476(1)(c) was to allow the juvenile court to assume jurisdiction both in cases in which a child is harmful to himself or herself or to others and in cases in which a child is threatened with harm by another. In addition, *the legislature had in mind situations in which harm to others within a child's environment may be a circumstance that endangers the welfare of a child over whom jurisdiction is sought.*"

316 Or at 652 (emphasis added). Thus, the court explained that a condition or circumstance need not involve a child directly "but may be found harmful by reason of creating a harmful environment for the child." *Id.* at 653. In support of that conclusion, the court cited instances in which this court had held that evidence that a parent sexually abused one child in the home could support jurisdiction over other children in the home. *Id.* (citing *State ex rel Juv. Dept. v. Gates*, 96 Or App 365, 774 P2d 484, *rev den*, 308 Or 315 (1989); *State ex rel Juv. Dept. v. Rhoades*, 73 Or App 192, 698 P2d 66, *rev den*, 299 Or 443 (1985)).

In *Brammer*, we affirmed the imposition of dependency jurisdiction with respect to three children after their mother had been convicted of multiple sexual offenses involving her repeated abuse of a young boy in her own home while her children were in the home; the boy was the best friend of one of the mother's sons. 133 Or App at 547. In rejecting the mother's contention that jurisdiction was unwarranted because there was "no proof that she acted inappropriately toward her own children," *id.* at 549, we concluded:

"We have held that a child may be removed from an abusive environment if there is evidence of abuse of *any* child. * * * The question is whether that abuse created a harmful environment for her own children, such that the juvenile court should exercise jurisdiction. We find that it did. Mother exploited her role as T's care giver for the sake of her own sexual gratification. T was her son's best friend. The abuse took place in her children's home on a number of occasions over a period of eight months, when her own children and other children were in or around the home. * * * The court is not required to wait until other minors in the home are exploited before intervening to protect them."

*Id.* (emphasis in original; citation omitted); *see also State ex rel DHS v. Kamps*, 189 Or App 207, 74 P3d 1123 (2003) (where child suffered multiple fractures of arm and multiple bruises to the face and all of the injuries were consistent with child abuse, jurisdiction over child's half-brother was appropriate).

The postulate that "harm to one child presents a risk of similar or related harm to other children in the same household" makes a great deal of sense—common sense—particularly in cases involving sexual or physical abuse. But it is not a universal solvent that automatically justifies the blanket imposition of dependency jurisdiction, without differentiation among the circumstances of each child. Rather, and particularly, where, as here, jurisdiction with respect to one child is based on a failure to be responsive to that child's special needs and other children in the same household do not have similar special needs, we must be especially careful to assess each child's individual circumstances: Is *this* child at risk? In this context, at least, "one size fits all" approaches are illusory, and potentially dangerous.

Here, there is no evidence that T or J shares K's special needs. Indeed, there is no evidence that either has any special medical or psychological need for treatment. Conversely, there is no evidence that parents have failed to follow through on medical advice regarding T or J or have otherwise failed to be responsive to T's and J's "nonspecial" medical needs. Given those circumstances, we cannot infer that the circumstance of parents' medical neglect of K presents "a

reasonable likelihood of harm to the welfare" of T or J. *Smith*, 316 Or at 653.

We proceed to paragraph C. The operative allegations are as follows:

"The [children are] within the jurisdiction of the Court by reason of the following facts and pursuant to ORS 419B.100(1)(c).

"* * * * *

"C.   On or around 09-26-03, the father, Edgar Shugars, exposed the child, [K], to emotional abuse by behaving irrationally and involving her in a volatile situation in which he took [K] in violation of a court order, eluded police while driving recklessly with her in the car, and refused to pull the car over until the police had him surrounded. Mr. Shugars refused to exit the vehicle with [K] and the police were forced to extract him from the vehicle at gunpoint while [K] was present. This condition places the children under a threat of harm for further emotional abuse."

We begin by emphasizing our determination, on *de novo* review, that the material facts, as established at the jurisdictional hearing, differ substantially from those alleged in the petition. It is true that, as alleged, father took K in violation of a court order. However, it is not true that father "eluded police while driving recklessly"; rather, the police officer who stopped father testified that, while following father, he observed no traffic violations. Further, it is not true that father pulled over only after "the police had him surrounded"; rather, father pulled over, albeit belatedly, after being pursued by a single police officer.[3] Finally, it is not true that father "refused to exit the vehicle with K" when directed to do so; rather, the officer who stopped father immediately, and without any prior request, initiated "high risk" stop procedures based on information received from DHS.

With the facts so fixed, we return to the content of paragraph C—and, particularly, to its introductory and concluding statements that father, through his conduct, "exposed [K] to *emotional abuse*" and that that "condition

---

[3] Several other police cars arrived on the scene after father had stopped. 202 Or App at 309.

places the children under a threat of harm for further *emotional abuse*." (Emphasis added.) Those references to "emotional abuse" are, initially, troubling. ORS 419B.100(1)(c), the predicate for the petition's allegations, does not use the term "emotional abuse"; instead, it refers, generally, to "condition[s] or circumstances [that] are such as to endanger the welfare of the [child]." Nor, with one exception, does the Juvenile Code use that term.[4]

Further, "emotional *abuse*"—as distinguished from "emotional *distress*"—is an imprecise and amorphous term. Does "abuse" require a certain quality of harm to the victim, a particular mental state by the actor, or both? And, if the actor's mental state is material, is the requisite mental state one of intent, or of recklessness—or could merely negligent infliction of emotional trauma on a child be sufficient?[5] It is revealing—and perhaps ironic—that resort to dictionary definitions is unenlightening. *See Webster's Third New Int'l Dictionary* 8 (unabridged ed 2002) (defining "abuse" as, *inter alia*, "the act of violating sexually" or "physically harmful treatment" but providing no more generally applicable pertinent definition of "abuse").

■  However provocative the meaning of "emotional abuse" in this context may be, we need not resolve that question in this case. That is so because of the contextual function of the references to "emotional abuse," when viewed in the

---

[4] *See* ORS 419B.090(2)(a)(B) (among the "legal rights" of Oregon children is "[f]reedom from physical, sexual or emotional abuse or exploitation"); *cf.* ORS 419B.504(2) (termination of parental rights for "unfitness" may be predicated upon "[c]onduct toward any child of an abusive, cruel, or sexual nature").

[5] We note, parenthetically, that other statutes define "abuse" or "child abuse," in very different and particularized contexts, and those definitions encompass abuse that results in "mental injury" to a child. For example, ORS 12.117, which describes the statute of limitations for civil actions "based on conduct that constitutes child abuse," defines "child abuse" as including:

"(2)(a) Intentional conduct by an adult that results in:

"* * * * *

"(B) Any mental injury to a child which results in observable and substantial impairment of the child's mental or psychological ability to function caused by cruelty to the child, with due regard to the culture of the child[.]"

ORS 419B.005(1)(a)(B), which defines "child abuse" for purposes of child abuse reporting obligations, is substantively similar.

totality of the pleadings. As noted, all of the petition's allegations, including paragraph C, are predicated on ORS 419B.100(1)(c), which authorizes the imposition of jurisdiction when "condition[s] or circumstances * * * endanger the welfare of the [child]." Thus, the dispositive inquiry is whether father's *conduct*, as proved, gives rise to a "reasonable likelihood of harm to the welfare" of some or all of the children. *Kamps*, 189 Or App at 213. So understood, in context, the petition's description of that conduct as "emotional abuse" is just that—a description or characterization. In sum, our concern is father's conduct; the petition's characterization of that conduct is immaterial.

We return, then, to father's conduct, and to K. We do not question that, in absconding with K, father believed that he was acting in her best interests "to take her to a safe place." Still, regardless of that motivation, there can be no question that father's conduct foreseeably exposed K, who was already emotionally distraught, to circumstances that would substantially exacerbate her emotional distress. Once father took K in defiance of the court order, implicitly threatening the DHS worker as he did so, there could be no good ending. It was virtually certain that any resolution would involve, at the very least, father's arrest by armed and uniformed police officers in K's presence. Even assuming that the trauma uniquely associated with a "high risk" stop and arrest was not reasonably foreseeable, once father absconded with K, it was all but inevitable that K would suffer emotional distress of a different kind and degree than that resulting from her fears of being returned to foster care.

The circumstances are sad and unfortunate. Nevertheless, father, in willfully aggravating an already emotionally volatile situation, recklessly exposed K to substantially more severe emotional distress. In considering the totality of the circumstances, we are also especially mindful of K's special emotional needs. Accordingly, we conclude that the circumstances proved with respect to paragraph C warrant the imposition of jurisdiction as to K.

█    We reach a different conclusion as to T and J. They were not subjected to emotional distress as a result of father's conduct. Indeed, as noted, before engaging in the conduct

that underlies paragraph C, father had released T and J to the DHS worker in compliance with the court order. *See* 202 Or App at 308. Nor do we believe that father's conduct, which appears to have been precipitated by K's particular circumstances, presents a substantial risk of future similar conduct with respect to T and J. Accordingly, T and J are not subject to juvenile jurisdiction pursuant to paragraph C.

■    Finally, we turn to the allegations of paragraph D. DHS alleged that (1) parents have a "history of involvement" with DHS "due to issues of neglect and threat of harm"; (2) DHS "has offered numerous remedial services to the family" but "most services offered have been refused"; and (3) parents "continue to engage in behaviors that are neglectful to the children and place the children under a threat of harm."

Parents did, indeed, have a "history of involvement" with the agency before September 26, 2003. We emphasize, however, that all of that "involvement" occurred in a context in which DHS had *not* acquired jurisdiction over the children. That is, at the time of the filing of this petition, DHS had never previously *established* "neglect and threat of harm"— and, indeed, the court had dismissed the only prior (2001) petition alleging such conditions. Further, evidence in the record indicates that parents—perhaps mother more so than father—have not only availed themselves of some offered services, but have actually benefitted from those services.

With those qualifications, we address the neglect allegations of paragraph D. In that regard, we agree with the trial court that parents were deficient in failing to address "the smell issue" for all three children. Nevertheless, as amplified below, we conclude that parents' default in that regard is insufficient to support the imposition of jurisdiction as to any of the children.

"The smell issue," as the trial court characterized it, refers to the children smelling of cat urine. Both parents and many members of both parents' extended families adamantly denied that any of the children ever smelled of cat urine. However, virtually everyone else who came into contact with the children noted the odor. The odor was distinct enough, and unpleasant enough, to cause social problems for K at

school, as well as contributing somewhat to her school atten-dance problems. Moreover, it can be reasonably assumed that T and J may eventually experience some of the same dif-ficulties, given that parents seem unable or unwilling to rec-ognize the nature of the problem and remedy it.

Thus, the question is whether parents, by allowing the children to frequently smell of cat urine, have "place[d] the children under a threat of harm." On balance, we con-clude that the evidence, while disturbing, is insufficient to establish jurisdiction over the children on that basis.

We begin by emphasizing that, although the chil-dren, or perhaps their clothing, had an unpleasant odor, there is no evidence that the odor was related to, or caused, any health or medical problems with the children. Rather, the evidence is that the home reeked of cat urine, and, con-sequently, everything in it reeked of cat urine.

ORS 419B.090(2)(a) provides:

> "It is the policy of the State of Oregon to recognize that children are individuals who have legal rights. Among those rights are the right to:
>
> "* * * * *
>
> "(C) Freedom from substantial neglect of basic needs."

The legislature has not defined "basic needs" for pur-poses of ORS 419B.090, and we have not had the opportunity to explore, in this context, the exact meaning of "basic needs." In the realm of mental commitment cases, we have indicated that "basic needs" generally consist of food, water, and medi-cal care. *State v. Nguyen*, 180 Or App 541, 547, 43 P3d 1218 (2002). We do not assume, however, that the legislature nec-essarily viewed basic needs for adults suffering from mental illnesses to be the same as basic needs for children. The only statute we have found that attempts to define basic needs for children is ORS 329.145, which is a provision of the Oregon Education Act for the 21st Century, and concerns provision of services to families by school districts. ORS 329.145(2) defines "services" as "education and all other programs and services addressing one or more of a child's six basic needs as follows: stimulus, nutrition, health, safety, nurturance and

shelter." Although that statute has no direct applicability here, it does reflect that the legislature may view a child's "basic needs" as more extensive than food, clothing, and shelter.

Still, even assuming that the legislature intended a more expansive definition of "basic needs," we conclude for several reasons that parents' failure to remedy "the smell problem" here is not what the legislature had in mind when it set forth criteria for dependency jurisdiction in ORS chapter 419B. First, the legislature did not refer simply to "neglect of basic needs"; rather, it referred to *substantial* neglect of basic needs." The term "substantial," although it qualifies "neglect" rather than "basic needs," indicates that the legislature intended to address situations in which the failure to meet a basic need created serious problems for the child.

■        Second, although ORS 419B.090 reflects the legislature's policy decision concerning juvenile dependency, ORS 419B.100 implements those policies and, in the context of the present case, requires a showing that there exist conditions or circumstances that "endanger the welfare" of the children. ORS 419B.100(1)(c). Endanger connotes exposure to "danger," which generally involves "the state of being threatened with serious loss or injury[.]" *Webster's* at 573. A child is not in "danger," as that word is commonly understood, simply because the record demonstrates that the child or the child's clothing emits an unpleasant odor.

Finally, the legislature has instructed that the provisions of the juvenile dependency code "shall be construed and applied in compliance with federal constitutional limitations on state action established by the United States Supreme Court with respect to interference with the rights of parents to direct the upbringing of their children[.]" ORS 419B.090(3). The Supreme Court has long held that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 US 57, 66, 120 S Ct 2054, 147 L Ed 2d 49 (2000) (plurality opinion; citing cases). The Court in *Troxel* stated that "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for

the State to inject itself into the private realm of the family[.]" *Id.* at 68; *see also Reno v. Flores*, 507 US 292, 304, 113 S Ct 1439, 123 L Ed 2d 1 (1993) ("Even if it were shown, for example, that a particular couple desirous of adopting a child would *best* provide for the child's welfare, the child would nonetheless not be removed from the custody of its parents so long as they were providing for the child *adequately.*"). That formulation, of course, begs the question of what is a "fit" or "adequate" parent for constitutional purposes. Nevertheless, the Court has admonished that the "fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents[.]" *Santosky v. Kramer*, 455 US 745, 753, 102 S Ct 1388, 71 L Ed 2d 599 (1982).

Parents' failure to address, and remedy, "the smell issue" here may well fall short of what would be expected of "model parents." But that is not the standard—precisely because of the burdens that the exercise of dependency jurisdiction imposes on parental rights. Parents' default in that regard does not constitute a condition or circumstance "such as to endanger the welfare" of the children. ORS 419B.100(1)(c).

In sum, we conclude that the trial court properly exercised jurisdiction over K based on paragraphs B and C of the petition, but that the court erred in exercising jurisdiction over T and J.

Judgment establishing dependency jurisdiction over T and J reversed and over K based on paragraph D of petition reversed; otherwise affirmed.