182 P.3d 223 (2008)
219 Or. App. 1
In the Matter of G.A.C., a Minor Child.
G.A.C., Appellant,
v.
STATE ex rel JUVENILE DEPARTMENT OF POLK COUNTY, C.D.M., and G.C., Respondents.
In the Matter of V.R.C., a Minor Child.
V.R.C., Appellant,
v.
State ex rel Juvenile Department of Polk County, C.D.M., and G.C., Respondent.
In the Matter of A.R.M., a Minor Child.
A.R.M., Appellant,
v.
State ex rel Juvenile Department of Polk County, C.D.M., and G.C., Respondents.
Nos. A136614, A136621, A136622.
Court of Appeals of Oregon.
Submitted on Record and Brief February 19, 2008.
Decided March 26, 2008.
*224 Angela Sherbo and Karen S. Torry, Portland, filed the brief for appellants.
Richard Wasserman, Attorney-in-Charge, Civil/Administrative Appeals, waived appearance for respondent Juvenile Department of Polk County.
No appearance for respondents C.D.M. and G.C.
Before ARMSTRONG, Presiding Judge, and BREWER, Chief Judge, and RIGGS, Senior Judge.
BREWER, C.J.
Three children appeal from separate judgments dismissing the state's petitions for establishment of juvenile dependency jurisdiction over them on the ground that the state and the children had not proved that mother subjected the children to physical abuse or inappropriate discipline, thereby placing the children at risk of harm.[1] ORS 419B.100(1)(c). Neither mother nor the state has appeared on appeal. On de novo review, ORS 419A.200(6)(b), we reverse and remand.
The following facts were either undisputed in the record or established by a preponderance of the evidence. See ORS 419B.310(3) (facts alleged in a dependency petition must be established by "a preponderance of competent evidence"). The children named in the petition are V, a girl aged 15; G, a boy aged 16; and A, a girl aged 11. The children were taken into protective custody on March 30, 2007, after the Salem police notified the Department of Human Services (DHS) that officers were in the home and had reason to believe that V had been physically abused. Caseworkers Mawdsley and Silbernagel went to mother's home to investigate the incident. The caseworkers spoke to mother with police officers present, and they interviewed G and A at mother's home. Mawdsley also interviewed V in the foster home where V was placed.
Mother admitted to Mawdsley that she had struck V with a wooden spoon and that she probably "took it too far." Police officers took pictures of V's upper arm and upper rear thigh that showed red welts and bruising. There were no signs of physical injury to G or A. Officer Zohner, who assisted in the investigation, testified that mother's demeanor during police questioning was "very relaxed * * * [a]lmost nonchalant." Zohner testified that the home was "almost immaculate," and he had the impression that if anything was out of place "it would have been an issue."
Zohner was present while V was questioned. V reported that mother accused V of losing an Oregon Trail food stamp card and was dissatisfied with the way that she had cleaned the bathroom. Mother told V that she had better find the card, but V could not find it. V told police that mother stated that V was going to get a spanking and directed her to "go over to the stair." V testified that the blows hurt "pretty bad," rating the pain an eight or eight and a half on a scale from one to ten. V asked mother to stop, but mother refused. V told Silbernagel that she did not feel safe in the home. V had raised *225 welts on her arm and both legs that matched the pattern of the wooden spoon. She also suffered purple bruising. The injuries were observed four hours after mother hit V. Neither A nor G witnessed the incident because mother had instructed them to walk the dogs. When they returned home, mother had left the home in a car, and V asked to use G's cell phone. V called G's girlfriend and told her about the incident; G's girlfriend called her own mother, who reportedly called the police.
A told Silbernagel that she also gets hit with the wooden spoon but that V gets it more. A later denied that mother hits her and stated that mother had questioned her about her earlier statements to the caseworker.
G told the caseworkers that mother "spanks" V and A with a wooden spoon, that such spankings had occurred "many times," with mother sometimes, but not always, making the girls take off their pants and underwear, bend over, and put their hands on the couch. G said that mother used the spoon only for spanking, and he described it as being two and one-half feet long. According to G, something like this happened once or twice a week. Mother rarely explained why she was hitting. G also testified that mother previously had "knock[ed][V] upside the head or something." G told a police officer that mother used to spank G until they were involved in a fight, and G was arrested and placed in a juvenile detention facility. On that occasion, mother scratched G on the chest and shoulders to the point of bleeding and kneed him a couple of times in the genitals. G stated that, since then, mother no longer challenged him.
According to G, mother is quick to anger and has mood swings. G did not want to live with mother; he had run away from home the previous summer because he did not feel safe and did not want things to "escalate" in the way that had led to his previous involvement with the juvenile court. G acknowledged that he had been caught bringing girls into his bedroom when mother was not at home and that he had not brought his weekly grade reports home as mother had requested.
V testified that mother previously had spanked her with her clothes off. Mother had hit her with an open and closed hand and had hit her on the head. According to V, mother would hit her because "I'm in trouble  because I didn't do something right." Once or twice, mother also had pinched V's throat. However, V testified that mother hit her with the spoon "every time" she got in trouble. Mother also had given V and A bloody noses by hitting them on separate occasions in the past. Once, mother told V "before you call the cops, call the hospital to tell them there's a dead Mexican in the house." V testified that she understood that "the dead Mexican" referred to the person who had called the police to report what was happening in the home. V felt threatened by mother and did not want to return to her home.
During questioning by police on March 30, mother's demeanor changed from confrontive, combative, and aggressive, to passive and silent. Mother had difficulty focusing, answering questions, and tracking information. In Zohner's experience, "most people" are "more concerned" than mother appeared when questioned about alleged child abuse.
Mother admitted that she had caused V's injuries by hitting her with a wooden spoon. Mother testified that she hit V "about three times; what I felt was necessary." Mother testified that she told V to place her hands on the stair rail. Mother then "drew back" to hit V three times and twice V turned around. The first time she grabbed V's arm and put her back on the stair rail. V turned around again and "that's how I got her on the arm twice." Mother described this as "an accident." She then "made contact" with the back of V's thigh. Mother testified that she initially told a case worker that she might have "gone overboard" in hitting V, but at trial she did not believe that she had done so because previous discipline, including grounding V, locking her out of the computer, and taking away her cell phone, had not worked.
Mother acknowledged that she previously had hit V and has had trouble with V cleaning her room. She testified that, after taking *226 a parenting class, she would not go so far as to spank V until she had been "fighting with her" for two or three weeks and "trying other stuff." Mother testified that V had gotten into trouble a couple of months before the incident on March 30. According to mother, the "biggest one" was V's lying about her age and looking like a gangster in a photograph that V posted on MySpace. Mother stated  and V denied  that V also had communicated online with a 27-year-old man. Mother also stated that a friend of V's had gotten hair on the couch, and V put the hair in a seafood dish that mother had prepared after mother told V to clean up the hair.
Mother testified that she had "spanked" V and A with the wooden spoon on previous occasions. She denied hitting G recently, although she admitted that in the past she had struck G with a "strapper." When asked whether she wanted to continue spanking her children, mother testified that, although she hoped not to spank V in the future, "I know it's become necessary with [V] in dire circumstances like we came to after a series of events." Mother also testified that "I don't think I'm qualified any more to help [V] with all the psychological issues that she has." According to mother, V had been molested and raped "a couple times" when they were living in a home where drugs were manufactured and sold.
All three children were removed from mother's home on March 30 and placed in temporary foster care. As noted, the state filed dependency petitions seeking juvenile court jurisdiction over the children. As pertinent here, the state alleged that the children were within the jurisdiction of the juvenile court under ORS 419B.100(1)(c), which provides:
"Except as otherwise provided in subsection (6) of this section and ORS 107.726, the juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:
"* * * * *
"(c) Whose condition or circumstances are such as to endanger the welfare of the person or of others[.]"
ORS 419B.100(2) provides that "[t]he court shall have jurisdiction under subsection (1) of this section even though the child is receiving adequate care from the person having physical custody of the child."
Specifically, the petitions alleged that "mother has subjected the child[ren] to physical abuse or inappropriate discipline, which places the child[ren] at risk of harm." Father admitted that the children were within the court's jurisdiction based on the further allegation that he had failed to protect them from mother's actions. However, after the evidentiary hearing, the trial court dismissed the petitions against mother.[2] The trial court made no express credibility findings but, given the relative consistency between mother's and the children's testimony with regard to the nature of mother's actions, it does not appear that credibility was a significant factor in the court's decision. The best clues to the court's reasoning appear in two portions of the record. First, near the end of closing arguments, the court made the following statement:
"I know that in  there are those in our culture who believe that any physical force on a child is abuse, and inappropriate. And, there are those that believe corporal punishment far beyond this is reasonable. Some of that is cultural, some of it can be religious. And that  I know that our statutes have attempted to accommodate that to a reasonable degree. Obviously, you're not entitled to attack your child with a knife or a gun or something like that, to discipline them for some infraction. But, Oregon is not a state that has outlawed spanking, for instance. You're not allowed to spank your child to the point where you're breaking bones or  [h]as Oregon outlawed spooning? Does it matter how big the spoon is? Probably hitting with a 2x4 is probably beyond anybody's definition of reasonable, but at what point  at *227 what point does the law step in? I don't  I'm not aware of any law on this[.]"
The court then took the cases under advisement.
Second, in a later hearing after the court had entered the judgments dismissing the petitions, the court stated that it had not found "evidence of jurisdiction" for G or A other than "derivative from their sister" and concluded that "the State doesn't really have any business meddling with this family." From the foregoing excerpts, we infer that the trial court did not believe that mother's conduct with respect to V was serious enough to warrant taking jurisdiction as to her and that the evidence pertaining to G and A was merely derivative of the evidence as to V and, therefore, insufficient. With respect, we disagree.
ORS 419B.100(1)(c) calls for a fact-specific inquiry whether the court should take jurisdiction over children. State ex rel. Juv. Dept. v. Smith, 316 Or. 646, 652, 853 P.2d 282 (1993). In Smith, the court rejected the proposition that any specific condition or circumstance per se does or does not suffice to establish dependency jurisdiction under that provision. Id. Rather, the court must consider the totality of circumstances before it. Id. at 652-53, 853 P.2d 282. If, after, considering those circumstances, the court finds a "reasonable likelihood" of harm to the child's welfare, jurisdiction exists. Id. The pertinent conditions or circumstances need not involve the child directly but may be found harmful because they create a harmful environment for the child. Id. In deciding whether the juvenile court has jurisdiction, the court must determine whether the child needs the court's protection, not the nature or extent of the necessary protection. See State ex rel. Juv. Dept. v. Brammer, 133 Or.App. 544, 549 n. 5, 892 P.2d 720, rev. den., 321 Or. 268, 895 P.2d 1362 (1995) ("Our decision merely places the children under the protection of the juvenile court. Whether or not they remain in the home will be determined in a subsequent proceeding.").
In this case, mother attempted to justify her actions as discipline that was necessary as a last resort, because nothing else had sufficed to deter the children from misbehavior. Before considering whether the evidence supports mother's assertion, we examine the statutory framework that provides context for that analysis.
ORS 419B.090(2)(a) provides, in part:
"It is the policy of the State of Oregon to recognize that children are individuals who have legal rights. Among those rights are the right to:
"* * * * *
"(B) Freedom from physical, sexual or emotional abuse or exploitation[.]
"* * * * *
"(b) Parents and guardians have a duty to afford their children the rights listed in paragraph (a) of this subsection. Parents and guardians have a duty to remove any impediment to their ability to perform parental duties that afford these rights to their children. When a parent or guardian fails to fulfill these duties, the juvenile court may determine that it is in the best interests of the child to remove the child from the parent or guardian either temporarily or permanently."
In counterpoint, ORS 419B.090(4) provides, in part:
"It is the policy of the State of Oregon to guard the liberty interest of parents protected by the Fourteenth Amendment to the United States Constitution and to protect the rights and interests of children, as provided in subsection (2) of this section. The provisions of this chapter shall be construed and applied in compliance with federal constitutional limitations on state action established by the United States Supreme Court with respect to interference with the rights of parents to direct the upbringing of their children, including, but not limited to, the right to:
"* * * * *
"(c) Discipline their children."
Thus, although the dependency jurisdiction statute, ORS 419B.100, does not itself employ terms such as "abuse" or "physical injury," ORS 419B.090(2)(a)(B) recognizes a child's right to be free from "physical * * * abuse." It is logical therefore to infer that the existence of physical abuse is a circumstance *228 endangering a child's welfare. At the same time, the statute also recognizes the right of parents to discipline a child.
A related statute, ORS 419B.005(1)(a)(A), supports that understanding. It defines "abuse" for purposes of the mandatory child abuse reporting statutes, ORS 419B.005 to 419B.050, as including "[a]ny assault, as defined in ORS chapter 163, of a child and any physical injury to a child which has been caused by other than accidental means, including any injury which appears to be at variance with the explanation given of the injury." Thus, "abuse," for the purpose of mandatory child abuse reporting, includes criminal assault and any nonaccidental "physical injury,"[3] and also includes conduct intended as discipline when it "results in one of [those] conditions." ORS 419B.005(1)(b). It makes little sense to conclude that, in establishing a mandatory child abuse reporting scheme, the legislature would require the reporting to authorities of "abuse" that a juvenile court would not treat as a circumstance endangering a child's welfare.
We have not identified a case concerning juvenile court jurisdiction directly addressing the question of what constitutes lawful discipline. Cf. State ex rel Dept. of Human Services v. Shugars, 208 Or.App. 694, 715, 145 P.3d 354 (2006) (Shugars II) (recognizing authority of DHS to impose limits on physical discipline). The key inquiry in determining whether "condition or circumstances" jurisdiction is warranted is whether, under the totality of the circumstances, "there is a reasonable likelihood of harm to the welfare of the child[.]" Smith, 316 Or. at 652-53, 853 P.2d 282. The cases treat it as axiomatic that the physical abuse of a child endangers the child's welfare and, thus, furnishes a basis for the exercise of dependency jurisdiction. See, e.g., State ex rel. Dept. of Human Services v. Meyers, 207 Or.App. 271, 274-75, 284-85, 140 P.3d 1181, rev. den., 341 Or. 450, 143 P.3d 773 (2006) (relying, in part, on physical abuse of child as ground for termination of parental rights); State ex rel. DHS v. Kamps, 189 Or.App. 207, 213-14, 74 P.3d 1123 (2003) (physical abuse of a child constitutes a circumstance that endangers the child's welfare under ORS 419B.100(1)(c)); State ex rel SOSCF v. Imus, 179 Or.App. 33, 43-44, 39 P.3d 213 (2002) (juvenile court jurisdiction under ORS 419B.100 upheld, in part, based on evidence of physical abuse).
In sum, we conclude that ORS 419B.090 to 419B.100, considered in context, recognize a "discipline" exception where physical abuse is the predicate for "condition or circumstances" jurisdiction under ORS 419B.100(1)(c). It also follows that, if purported discipline constitutes a criminal assault under ORS chapter 163 or causes nonaccidental physical injury to a child, it is not lawful.
We need not decide whether mother's conduct toward V constituted a criminal assault. As discussed, where juvenile dependency jurisdiction is concerned, conduct that endangers a child's welfare is not limited to criminal conduct, and the evidentiary standard is one of preponderance, not the absence of reasonable doubt. If a parent causes physical injury to a child by nonaccidental means, the parent has physically abused the child, and such abuse cannot constitute lawful discipline. Mother in this case caused physical injury to V by other than accidental means. V suffered raised red welts and bruising on her arms and thigh that caused her substantial pain, according to her testimony, at a level of eight or eight and a half on a scale of one to ten. The photographs of V's injuries are consistent with her testimony. Because mother abused V by causing her physical injury, which, in turn, endangered V's welfare, V was within the juvenile court's jurisdiction under ORS 419B.100(1)(c).
*229 Moreover, even if the definitions in ORS 419B.005(1)(a) did not inform our analysis, we readily conclude that mother's actions on March 30 endangered V's welfare. Mother appears to have a distorted view of her situation, testifying that she learned to use "different" discipline techniques in a parenting class that she took three years earlier, yet admitting that she continued to hit her children as punishment. Mother testified that "spanking" had "become necessary" with V in "dire circumstances," but the record does not support mother's assertion that she used hitting as a last resort response to impose discipline. Rather, the evidence shows that mother was angry because V lost a food stamp card and that she vented that anger by repeatedly striking V. Although mother characterized her actions as "spanking," she struck V with a long wooden spoon at least three times, leaving raised welts on her arms and thigh that were visible four hours later when police and DHS case workers came to the home. And, the marks remained visible at least until V left her first foster home. In short, mother's conduct was not "discipline"  rather, it was physical abuse that caused substantial welts, bruising, and pain. That conduct endangered V's welfare and, accordingly, V is within the jurisdiction of the juvenile court.
The question remains whether the court properly dismissed the petitions as to A and G on the ground that those cases were "derivative" of V's. We have held that a child may be removed from an abusive environment if there is evidence of abuse of any child. See, e.g., Brammer, 133 Or.App. at 549, 892 P.2d 720; State ex rel. Juv. Dept. v. Miglioretto, 88 Or.App. 126, 129, 744 P.2d 298 (1987). Recently, we have clarified that the axiom that "`harm to one child means a risk to others' is not absolute and immutable." State ex rel Dept. of Human Services v. Shugars, 202 Or.App. 302, 311, 121 P.3d 702 (2005) (Shugars I). In Shugars I, the court found that the "particularized nature" of one child's condition and circumstances warranted dependency jurisdiction over her but did not support the exercise of jurisdiction over her two siblings. Id. In that case, the older child, unlike the other children, had special needs, including serious medical problems, that the parents had been unable to address. We held:
"The postulate that `harm to one child presents a risk of similar or related harm to other children in the same household' makes a great deal of sense  common sense  particularly in cases involving sexual or physical abuse. But it is not a universal solvent that automatically justifies the blanket imposition of dependency jurisdiction, without differentiation among the circumstances of each child. Rather, and particularly, where, as here, jurisdiction with respect to one child is based on a failure to be responsive to that child's special needs and other children in the same household do not have similar special needs, we must be especially careful to assess each child's individual circumstances: Is this child at risk? In this context, at least, `one size fits all' approaches are illusory, and potentially dangerous."
Id. at 315, 121 P.3d 702 (emphasis in original).
In this case, although it was mother's conduct toward one child that precipitated state intervention, the evidence supports establishment of jurisdiction for all three children. In light of the ordinary nature of V's conduct on March 30  losing something and inadequate housekeeping  it is reasonable to infer that the circumstances leading to the abuse that day are likely to recur. Mother gave little indication in her testimony that she would handle things differently in the future. Unlike in Shugars I, the evidence here did not differentiate the risk of harm to V from risks to the other children. See Imus, 179 Or.App. at 35, 39 P.3d 213 (evidence supported jurisdiction of the juvenile court over two children based on the allegation that younger child was subjected to physical abuse by way of severe facial bruising caused by a nonaccidental physical blow). Although V was the victim of mother's conduct on March 30, all three children have been similarly struck at different times. Both A and G testified that mother has hit them with her hands and with objects when they are "in trouble." Although mother may have stopped hitting G, that change was recent and was a consequence, *230 not of a change of approach on mother's part, but of the grim reality that mother can no longer physically intimidate G. Even though that change may reduce the risk of physical harm to G while he is in the home, G testified that he has run away in the past as a result of mother's mistreatment, which places him at risk of harm. Moreover, the evidence established that mother hits A and is likely to continue doing so.
ORS 419B.100 authorizes the state to intervene not only when children have suffered actual harm, but to protect children from a substantial risk of harm. State ex rel. Juv. Dept. v. Gates, 96 Or.App. 365, 774 P.2d 484, rev. den., 308 Or. 315, 779 P.2d 618 (1989); see also ORS 419B.005(1)(a)(G). Under the totality of the circumstances, mother's conduct has endangered the welfare of all three children, and the children are within the jurisdiction of the juvenile court under ORS 419B.100(1)(c).
Reversed and remanded with instructions to enter judgments finding that children are within jurisdiction of juvenile court based on allegations in paragraph 1 of petitions.
NOTES
[1] The children do not assign error to the trial court's dismissal of the portions of their petitions alleging that mother has mental health problems that have placed the children at risk of harm.
[2] The court's judgment regarding father was set aside after the court dismissed the petitions against mother.
[3] "Physical injury" is not defined in the juvenile dependency statutes but, for purposes of the criminal code, it refers to an "impairment of physical condition or substantial pain." ORS 161.015(7). The legislature has used that definition in civil contexts as well. See, e.g., ORS 30.936 (defining claim for physical injury, for immunity purposes, with reference to ORS 161.015). There is no reason to believe that the legislature intended a different meaning for the term in the child abuse reporting statutes. Cf. ORS 419B.035 (defining "serious physical injury," for purposes of child abuse confidentiality statute, with reference to the definition of that term in ORS 161.015).