Argued and submitted April 11, affirmed August 2, petition for review denied
October 3, 2006 (341 Or 450)

In the Matter of
Kiallie Meyers and
Ana Gabriela Larrazabal Gonzalez Easton,
Minor Children.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES,
*Respondent,*

*v.*

Kathryn Marie MEYERS,
aka Kathryn Marie Easton,
*Appellant.*

03-662J, 03-663J; A130450

140 P3d 1181

Daphne E. Mantis argued the cause and filed the brief for appellant.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Schuman, Judge, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

**DEITS, J. pro tempore**

Mother appeals from a judgment terminating her parental rights to her daughters, K and A, who were seven and five at the time of trial. Mother's parental rights were terminated on the grounds that she was unfit and that she neglected the children. ORS 419B.504; ORS 419B.506. Mother challenges the admission of hearsay statements of one of her children and the termination of her parental rights. On *de novo* review, ORS 419A.200(6)(b), we affirm.

Mother was 26 years old at the time of trial. She had one child, S, with her first husband, Chris.[1] Mother and Chris's marriage was dissolved in 2004. Mother testified that, after the parties separated on or about December 1997, Chris became violent toward her. In 1998, mother began a relationship with Mendoza who, according to mother, was physically and emotionally abusive. Mother next had a relationship with the purported father of K. He has not maintained contact with mother or K. Mother then became involved with A's father, Felipe, who physically abused mother. In 2001, mother began a two-year relationship with Roberto. Mother testified that she was using drugs at this time. Mother left Roberto and began a relationship with Carlos. He was highly abusive of mother. She testified that he "would beat me from head to toe with a belt. * * * I would go to work with black eyes. I wasn't allowed to talk to my family members." Carlos was arrested in December 2003 after mother called the police. However, she reunited with him later.

Mother's first contact with DHS was in July 2003. DHS received a referral that mother was not properly supervising S, K, and A, who were six, five, and two at the time. The caseworker who went to mother's apartment found the children playing alone outside. Mother was told that it was not appropriate to allow the children to play alone outside and she agreed that she would not let it happen again.

---

[1] S was removed from mother's home at the same time that K and A were removed. She is now living with her father and is not a subject of this termination proceeding.

Mother was offered parenting services at that time, but she refused the offer.

In October 2003, after being told that drugs were being used in mother's apartment in the presence of young children, the police contacted mother. The police went to mother's apartment where they found mother, Carlos, and two of the children. The police discovered drug paraphernalia and methamphetamine residue in the apartment. Mother admitted to the police that she had recently smoked methamphetamine. Mother was eventually convicted of unlawful possession of a controlled substance and sentenced to 18 months' probation based on that incident. Later that month, DHS again contacted mother after receiving a report of possible danger to the children because of drug use and domestic violence in the home. Mother told the DHS caseworker that she was going to participate in drug treatment through drug court.

In November 2003, DHS responded to a referral regarding possible physical abuse of K. K was contacted at her elementary school by Welch, a DHS caseworker. Welch noticed a bruise on K's face consistent with a handprint. K told Welch that "Carlos smacks us around" and that she and her sisters were spanked with a belt. K also told Welch that Carlos hit mother in their presence. Welch contacted mother about the bruise. Mother said that she had been told that K had fallen out of a window. When mother was told that the bruise was consistent with someone hitting K, mother said that it must have been a neighbor. When she was informed that K had said that Carlos had hit her, mother became angry and said that that was not true, that Carlos would never hurt her babies. The children were removed from the home at that time, and mother was told that Carlos could not remain in the home if the children were to return. Mother continued to deny that Carlos had hurt any of the children and was not willing to make him leave. She continued to live with him after the children were removed.

Following the removal of the children in November 2003, DHS filed petitions to find K and A within the juvenile court's jurisdiction, alleging that conditions and circumstances were such as to endanger the children's welfare due

to the physical abuse of K, mother's substance abuse problems, and domestic violence in the home. In December, mother admitted the allegations in the petitions, and the court found K and A to be within its jurisdiction. The children were committed to the legal custody of DHS, and mother was ordered to complete drug and alcohol treatment, undergo a psychological evaluation and follow through with all recommended services, obtain domestic violence counseling, and participate in visitation with the children as approved by DHS.

Mother underwent a psychological evaluation by Joffe, a licensed psychologist, in December 2003. Mother admitted her drug use to Joffe. She told Joffe that in 2003 she was using methamphetamine every day that she could arrange it. She also told Joffe that she had stopped using drugs in October 2003. However, at the termination trial, mother admitted that she was still using drugs at the time that Joffe evaluated her. Joffe diagnosed mother with dysthymic disorder, amphetamine dependence in early remission, post-traumatic stress disorder, and physical abuse as an adult. She recommended that mother continue her drug and alcohol treatment and be regularly monitored with random urinalysis (UA). She also recommended that mother obtain mental health treatment.

Following the juvenile court's assumption of jurisdiction, DHS continued to work with mother on the issues of her drug dependence and domestic violence and sought to assist her in visiting with the children. During the spring of 2004, however, she continued to use methamphetamine. DHS encouraged her to participate in a residential drug treatment program, but she insisted that she did not need residential treatment. Residential treatment was arranged for mother in May 2004, but mother failed to show up at the arranged admission time. During that same time period, mother also was supposed to be participating in the Lane County drug court program. Mother also did not comply with that program. She was jailed for two days for her failure to comply with the court's treatment program and was terminated from the program in late February 2004.

In addition, in the spring of 2004, mother was assigned a "tracker" as part of the Relief Nursery program. The tracker for the program, George, reported that she first visited mother in May 2004. At their initial meeting, mother told George that she did not have a problem with drugs and that she had not been using recently. When George went to pick up mother to attend a 12-step meeting, mother was not home, but George found a man was in the apartment who appeared to be under the influence. George asked mother to come by the DHS office before a scheduled visitation with her children to do a UA. The UA confirmed the presence of methamphetamine. Following the positive UA, mother agreed to participate in treatment. However, when George went to pick up mother to take her to treatment, she was never home. Mother's case at the Relief Nursery was closed due to her failure to cooperate.

During the spring of 2004, mother maintained some visitation with K and A. After one visit in March, however, K told caseworker Heiser that mother had left her alone when she went to the store and that she had been very scared when she woke up and was home alone. According to Heiser, mother did not always show up for visitation and, when she did not, the children were "devastated." Heiser testified that in June 2004 she told mother that her visits would be cancelled if she did not meet with her about the failure to show up for visitations, but mother did not do so. Heiser said that, during the time that she had mother's case, mother made no progress in overcoming the obstacles to the return of her children and that mother never acknowledged that her drug use affected her children or her parenting. The case was transferred to a new caseworker in June 2004.

In May 2004, mother underwent another psychological evaluation with Basham, a licensed psychologist. Basham diagnosed mother with amphetamine dependence in early partial remission, post-traumatic stress disorder, major depressive disorder, and a personality disorder, not otherwise specified, with borderline, antisocial, and paranoid features. Basham testified that all of those diagnoses negatively affected mother's ability to parent and that she needed treatment to deal with them. Basham believed that it was crucial that mother participate in a long course of treatment for her

chemical dependency. He also recommended domestic violence counseling, parenting classes, and possibly mental health treatment. Basham said that if mother did not participate in domestic violence counseling, her children would be at risk in that mother would likely involve herself in a violent relationship and choose an abusive partner.

In June 2004, mother's attorney asked DHS to pay for services for mother, including drug treatment, domestic violence counseling, the Relief Nursery program, and Looking Glass counseling. DHS agreed to do so and approved those services. In July 2004, mother was evaluated for treatment at Willamette Family Treatment Services. Mother told the evaluator that she did not think that she needed treatment but that she would do so to get her children back. She also told the evaluator that her ability to stay clean was good and that her "meth use never affected her children." Mother was admitted to the treatment program on August 2, 2004, but left on August 10. She said that she left against staff advice because the nurse would not allow her to go to the emergency room for treatment of hypoglycemia. Apparently, mother had become very angry with the staff—cursing and screaming at them. She was picked up by two men when she left the treatment program. Mother said that treatment did not go well because "I didn't like the fact that I couldn't go to the store. It was just little things that I couldn't do."

On August 17, 2004, a permanency hearing was held. Mother did not attend the hearing. At that time, the court relieved DHS of responsibility to reunite mother and the children and held that it was in the children's best interest that the alternative plan of termination be implemented. DHS filed a petition to terminate mother's rights to K and A on September 3, 2004.

Later in September 2004, DHS learned that mother had moved to Klamath Falls. The move was made without the permission of her probation officer and in violation of the terms of her probation. Mother did not contact her probation officer until December 2004. The move also made it impossible for DHS to provide mother with services that had been arranged for her. Mother initially lived with her aunt, uncle, and cousin in Klamath Falls. Apparently, however, the uncle

drank heavily and the cousin was constantly offering mother drugs. Mother did not ask DHS for any services in Klamath Falls except for payment of a bill at Klamath Community Treatment Center (KCTC), which DHS approved. DHS also agreed to pay for mother to go to Eugene to visit the children once a month. Mother did not visit the children at all between September and November 2004. She did visit the children once a month from January 2005 through the time of trial in August 2005.

In Klamath Falls, mother moved from her aunt's and uncle's house to live with Stowers. In January 2005, an incident occurred in which the police went to mother and Stowers's home and found mother upset and crying with blood on her face, lips, and nose. Mother told the police that Stowers had hit her. Stowers admitted that he had hit mother and was charged with Assault IV. Mother then moved in with Long, a recovering addict. She stayed at Long's residence for a few weeks and then moved in with a female friend from Alcoholics Anonymous, Dahlen. They were evicted from their apartment in June 2005. Mother then began a relationship with Saunders who had been released from prison a few weeks before mother met him. Saunders apparently had previously been subject to restraining orders relating to two different women. Mother said that her relationship with Saunders was not sexual, and she testified at trial that she did not have a boyfriend. At the time of trial, mother was working for a friend cleaning houses.

Mother testified at trial that she had been drug and alcohol free for 385 days. She said that her plans for the future were to become more independent and to obtain steady employment. She was scheduled to start a six-week program at Klamath Rehabilitation to train as a certified nursing assistant. Mother said that she loved her children and wanted them back. She said that she believed that they did suffer because of her boyfriend Carlos. Mother testified that, after her children were removed, she went into a depression and began using more drugs. She acknowledged that her drug use affected her parenting ability. Mother said that she had investigated domestic violence counseling at the Crisis Center in Klamath Falls and that classes were available. She did not enroll and, when asked why she did not

enroll, said that she had no reason for not doing so. She also agreed that she needed parenting classes but did not enroll.

As noted above, while in Klamath Falls, mother participated in outpatient drug and alcohol treatment at KCTC. Lockhart was mother's counselor there until April 2005. He testified at trial that he believed that mother was sober at the time of trial. Lockhart said that mother was resistant to treatment at the beginning of her involvement in the program but became more accepting and engaged over time. Mother told Lockhart that she was living with a boyfriend. She told him that the boyfriend was sober, but she did not tell him that the boyfriend was physically abusive. Lockhart said that he tried to encourage mother to get back into compliance with the terms of her probation, but that she had an "I am going to do things my way attitude." She told him that she was angry that she was expected to get domestic violence counseling and parent training. He said that such services were available in Klamath Falls but, to his knowledge, mother never sought out those services. Lockhart testified that he discussed with her the need to obtain those additional services during her drug treatment if she wanted her children back. Lockhart said that, near the end of the time that he worked with mother, she said that she was having trouble setting boundaries. In his view, mother's choice of men was a problem for her that they had worked on. He said that, at the time that he ended his work with her, he thought that mother had made a good change and was receptive to new ideas on how to make her life better.

In May 2005, Rogers-Wilson took over mother's treatment at KCTC. Rogers-Wilson said that mother did not have any positive UAs while she was in treatment at KCTC. She said that, when she took over the case, she noted that mother had been in treatment an unusually long time and that she and her supervisor agreed that mother should graduate, which she did. Rogers-Wilson also said that mother had an "I'm going to do it my way" attitude. After graduation, mother's transition plan was a self-directed plan. Apparently, she did return to a program meeting in July 2005 and was showing pictures of her new boyfriend, who she said had recently been released from prison. Rogers-Wilson gave

mother a "fair" prognosis to maintain her sobriety, because of her concerns about mother's attitude.

At the time of trial, K and A were living with mother's sister-in-law, Easton. The children were placed in Easton's home after they were removed from mother's home in 2003. Easton and her husband had cared for the children previously. When K came to their home at that time, she still had the handprint on her face. She told Easton that Carlos, mother's boyfriend, had hit her and that she had tried to tell mother but that mother did not believe her. Easton said that, when K and A were first placed with her, A was very needy. K acted as A's mother and would do almost everything for her. Both children woke at night crying. K was frightened by a dream that her mother would come and take her. Both children were also underweight and would gorge on food. K had asthma when she came to the Easton home, but since living there it has not recurred. K also told Easton that Carlos had pulled his pants down, displayed his penis, and had asked her to have sex with him. She said that she ran out of the room. K also told Easton that both Carlos and Roberto had given A some beer. K told Easton that mother would leave them home alone and that sometimes she would park the car outside other people's houses and leave the children in the car. K also said that mother and Carlos would withhold food from them as punishment. Easton testified that both girls are doing very well in all respects.

As noted, mother challenges the admission of certain evidence and the termination of her parental rights. We first address her evidentiary arguments.

■ Mother assigns error to the trial court's admission of hearsay statements of K offered against mother. We have held, however, that statements of children regarding abuse may be used in termination proceedings as statements of a party opponent. *State ex rel Juv. Dept. v. Cowens*, 143 Or App 68, 72, 922 P2d 1258, *rev den*, 324 Or 395 (1996). Mother argues that the holding of *Cowens* is not applicable here because the interests of the children and the state completely coincide. We disagree. In some respects, the interests of the children and the state do coincide. However, the children have dual interests in a case such as this. They continue to

also have an interest in the right to maintain and enjoy the relationship of parent and child. *Id.* at 71 (quoting *State ex rel Juv. Dept. v. Wade*, 19 Or App 314, 319, 527 P2d 753 (1974), *overruled on other grounds by F. v. C.*, 24 Or App 601, 610, 547 P2d 175 (1976)). Accordingly, the trial court did not err in allowing the hearsay testimony of K as a statement of a party opponent.

■      We turn to mother's argument that the trial court erred in terminating her parental rights to K and A. The termination petition alleged that mother's rights should be terminated under the unfitness statute, ORS 419B.504, and the neglect statute, ORS 419B.506. Because we conclude that the state proved that termination was justified based on mother's unfitness, it is unnecessary to address whether mother's parental rights should be terminated on the ground that she neglected the children by failing to pay child support.

The unfitness statute, ORS 419B.504, provides, in part:

> "The rights of the parent * * * may be terminated * * * if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change."

ORS 419B.504 has been construed to impose two separate requirements before a trial court may terminate a parent's rights:

> "ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.' That second part of

the test for termination requires the court to evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' "

*State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001) (quoting ORS 419B.504).

■      As set forth above, the first step in determining whether mother is unfit for purposes of the termination statutes is to decide whether mother has engaged in some conduct or has a condition that makes her unfit. As with all of the factors in a termination proceeding, the state must prove that factor by clear and convincing evidence. ORS 419B.521(1); *State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 790, 126 P3d 758 (2006). Mother argues that the trial court erred because the state failed to prove that mother had any condition or engaged in any conduct that rendered her unfit to parent at the time of the trial. Mother relies on evidence that she was clean and sober at the time of trial and had been for more than a year. She also relies on her assertions that she has worked on and plans to do more work on the other issues that have interfered with her ability to be a minimally adequate parent; namely, her poor choice of relationships and continued exposure to domestic violence, as well as her mental health issues.

After reviewing all of the evidence in this case, we conclude that the trial court's finding that the state met its burden to prove that mother was unfit was correct. The record here clearly establishes that mother's substance abuse has seriously interfered with her ability to parent her children and has, in fact, endangered her children. The evidence shows that mother has made significant progress in dealing with her drug and alcohol dependence. Despite a history of many relapses, she apparently has been clean and sober for about a year, which, of course, is highly commendable. The evidence indicates, though, that, based on mother's past behavior, there is a reasonable chance that she will not be able to maintain her sobriety. Her last treatment provider characterized her prognosis for success as only "fair."

Even assuming, however, that mother truly has permanently conquered her substance dependence, her other

conduct and conditions render her presently unfit to parent. Before and after the time that mother became a parent, she has repeatedly established relationships with abusive partners. That has resulted not only in physical and mental abuse to her but to the children as well. Mother was made aware of the abuse of the children by at least one of her abusers, Carlos, and failed to protect the children. One of the children reported that she told mother about the abuse but that mother did not believe her. In fact, even after the children were removed from her care because of Carlos's abuse of them, mother continued to live with him.

The evidence also shows that, despite her apparent success with her substance abuse problems, mother has continued her pattern of instability and abusive relationships. After she moved to Klamath Falls, she continued to move from place to place and to associate with persons who had histories of criminal activity and addiction. In Klamath Falls, she lived with at least one person who abused her. Mother was told by friends and counselors in both Eugene and Klamath Falls that she needed to improve her choice of relationships and that she needed to obtain domestic violence and parenting counseling in order for her children to be returned to her. The evidence is that mother was told where such help was available in both cities and that she was offered assistance in obtaining such help. Nonetheless, mother failed to obtain that critical help. When asked at trial why she had not obtained domestic violence counseling, she said that she had no reason.

Basham was very concerned about mother's history of violent relationships and her failure to obtain treatment for those issues. He testified that it would be necessary for mother to undergo domestic violence treatment and to demonstrate that she had benefitted from such treatment before he would consider it safe to place the children in her care. He explained:

"I found [mother] to have other significant psychological problems that will impair her ability to parent. So simply ending drug use is not sufficient to indicate readiness to parent. So if the other problems are not addressed, if the

personality disorder characteristics I saw at the time continued, then no amount of time at being drug free would be sufficient."

The evidence also establishes that mother's conduct and conditions were seriously detrimental to her children, K and A. As discussed above, K was physically abused and both children were exposed to their mother's abuse. When the children went to Easton's home to live after being removed from mother's home, they demonstrated clear signs of neglect including being underweight and food gorging, parentified behavior of K toward A, nightmares, crying, and other behavior indicative of their insecurity. It is apparent that continued instability and exposure to abuse would be harmful to these children, who are now well adjusted in Easton's care.

Because we have found that mother has engaged in conduct and has conditions that have resulted in serious detriment to the children, we consider whether the evidence establishes that "integration of the child[ren] * * * into the home of the parent or parents is improbable within a reasonable period of time due to conduct or conditions not likely to change." ORS 419B.504. We conclude that integration of these children into mother's home is improbable within a reasonable period of time.

As we explained in *State ex rel SOSCF v. Lehtonen*, 172 Or App 584, 592, 20 P3d 210, *rev den*, 333 Or 73 (2001), the critical question in this type of case is "whether, within a reasonable time, mother will be able to overcome her deficiencies so as to allow her to function consistently as a minimally adequate parent." As discussed above, mother has had a history of relapses, but most recently has made some significant progress in overcoming her drug and alcohol dependence problems. Were that mother's only deficiency, it would be a closer question as to whether the state has shown by clear and convincing evidence that it is improbable that integration into mother's home will occur in a reasonable time.

As discussed above, however, mother has other conditions and has engaged in other conduct that have had a serious detrimental effect on her children, and she has continued to engage in such conduct that poses serious risks to

her children. Despite her success with her substance dependence issues, mother has continued to be involved in relationships involving domestic abuse. Further, although she has been told of the importance of obtaining counseling for domestic abuse and for parenting training and has been advised where such treatment is available, mother has completely failed to even begin such treatment. Mother has had a long pattern of instability and involvement in abusive relationships, and has completely failed to take any steps to allow her to deal with those issues even after being told repeatedly that she must obtain such help in order to be reunited with her children. In addition, the evidence demonstrates that reasonable efforts to assist her have been made by available social agencies. Despite mother's knowledge of the importance of her need to obtain assistance in the areas of domestic abuse, parenting, and mental health issues, she has failed to make necessary adjustments or, in fact, to make any effort in those respects toward achieving lasting adjustments. In view of this, we believe that it is improbable that mother will be able to overcome her deficiencies so as to enable her to provide a safe home for her children and allow the reintegration of the children into her home within a reasonable time.

■      We also conclude that the termination of mother's parental rights is in the children's best interests. The evidence shows that the children have overcome the physical and emotional difficulties that they had when they first went to live with the Eastons after being removed from mother's home. They are now apparently very well adjusted and doing well in all respects in the home of the relatives with whom they are living and who wish to adopt them. In view of our conclusion that, under all of the circumstances here, reintegration of the children into mother's home is not likely to occur within a reasonable time, we believe that the children's need for permanence and stability at this point in their lives dictates that such permanence and stability not be deferred. We conclude that termination of mother's parental rights at this time is in the best interests of the children.

For all of the above reasons, on *de novo* review, we conclude that mother's parental rights to K and A should be terminated.

Affirmed.